614 A.2d 560

Joyce CRYSTAL

v.

WEST & CALLAHAN, INC.

No. 152, Sept. Term, 1991.

Court of Appeals of Maryland.

Oct. 27, 1992.

Motion for Reconsideration Denied Dec. 4, 1992.

Anne C. Ogletree, Denton, argued, for appellant.

J. Joseph Curran, Jr., Atty. Gen., William Leibovici, and John Nethercut, Asst. Attys. Gen., for the State of Md., amicus curiae.

Harry M. Walsh, Jr., Easton, argued and on brief (Walsh & Phillips, P.A., on brief), for appellee.

Argued before MURPHY, C.J., and ELDRIDGE, RODOWSKY, McAULIFFE, CHASANOW, KARWACKI and ROBERT M. BELL, JJ.

RODOWSKY, Judge.

This case involves the construction of the Maryland Door–to–Door Sales Act. If a transaction is subject to that statute, the buyer has an absolute right to cancel the contract within three business days, and the seller must make certain disclosures concerning that right of cancellation. Here the seller made over $23,000 worth of improve-

ments to the appellant's home, without having made the required disclosures. The question is whether the buyer may cancel some one and one-half years after the work was completed and keep the improvements without having paid for them.

Appellant, Joyce Crystal (Crystal), purchased a contemporary waterfront home in Caroline County and moved there from Massachusetts in November 1988. The house had an opening in the second floor through which light from a skylight in the roof could reach the first floor. Crystal thought the opening could be dangerous, and she decided to have it closed. An Easton realtor brought a contractor, Charles Callahan (Callahan), of the appellee, West & Callahan, Inc. (West & Callahan), to the house. It is not clear how the realtor became aware of Crystal's interest in discussing the matter with a contractor. At some point while Callahan was in the house, for the purpose of discussing the possibility of closing the floor or of actually doing that work, Crystal asked Callahan about another home improvement that became the subject of this dispute: extending and enclosing a screened-in porch.

Crystal and Callahan orally agreed that Callahan would extend the porch six to eight feet and enclose it with walls and windows. There was no written contract. There were no written plans. Callahan did not give Crystal written or oral notice of a right to cancel. Crystal and her ex-husband, who was present during several of the conversations with Callahan, testified that Callahan estimated that the job would cost $10,000. Callahan testified that the contract was on a time and materials basis, that he never gave an estimate of the total price, and that the $10,000 figure estimated the cost for certain high-quality windows and doors to be incorporated into the work.

The problems began when Crystal came home one day and discovered that Callahan's workers were removing the roof from her old porch. The workers installed a new, raised roof. It was Crystal's understanding that the existing roof would be maintained, and a new section abutting

the old one would be added over the porch extension. Callahan believed that Crystal had approved a new roof and, moreover, that the only way to do all that Crystal wanted was to install an entirely new roof. Callahan eventually installed a second, lower roof, and charged Crystal on the basis that the work had been changed in progress.

Callahan submitted two bills, one in January 1989 for work to that point totalling $13,448.28, and a final bill in April for $10,321.50. Crystal paid $2,000 as a "good faith" payment on the total bill of $23,769.78. She refused to pay the balance because the price was considerably higher than the estimate she said she received, and because she was generally dissatisfied with the work. In addition to the dispute about the roof, Crystal alleged a number of workmanship defects, including improperly installed windows, installation of the wrong type of heating system, roof leakage, and improper matching of paint and materials.

West & Callahan filed suit in August 1989 in the Circuit Court for Caroline County to collect the balance. Crystal answered, denying liability, and in November 1989 counterclaimed for damages. One year later, on November 16, 1990, Crystal filed an amended counterclaim, alleging for the first time in a new count that Callahan violated the Door–to–Door Sales Act by, among other things, failing to provide Crystal with the required notice of cancellation. The amended counterclaim demanded return of the $2,000 previously paid. Also on November 16, 1990, Crystal's attorney wrote to West & Callahan and its attorney stating that Crystal "hereby cancels the transaction alleged in your complaint."

After a non-jury trial on the merits the court entered judgment for West & Callahan in the principal sum of $21,769.78. This represented the full value of the work, utilizing the amount billed to evidence value, less the $2,000 credit. The court also awarded prejudgment interest.

Crystal had moved for summary judgment and for judgment at the close of the plaintiff's case, without success, on

the ground that the statutory right to cancel had been effectively invoked by her. At the end of the case the circuit court held that the statute did not apply to the subject transaction. The court did not articulate its analysis underlying that conclusion.

Crystal appealed to the Court of Special Appeals. We issued the writ of certiorari on our own motion prior to consideration of the matter by the intermediate appellate court.

Three issues of coverage under the Door–to–Door Sales Act are identified in Crystal's brief. She argues that (1) the statute applies to home improvement transactions, (2) where the seller continuously fails to give the required notice, there is no limitation on the length of time during which the right of cancellation may be exercised, and (3) in the event of a cancellation authorized under the statute, the seller has no recovery in quantum meruit. The Consumer Protection Division of the Office of the Attorney General of Maryland (CPD) has filed an amicus curiae brief supporting the positions advanced by Crystal.

We shall hold that there is no exclusion of home improvement transactions, by virtue of their being such, from the Maryland Door–to–Door Sales Act. We shall also hold, however, that the Maryland version of the right to cancel does not continue as of right until disclosures are made by the seller, and that, under the undisputed facts, Crystal's attempted cancellation was untimely. Consequently, it is unnecessary to decide here what the role, if any, of quantum meruit might be following an effective cancellation of a door-to-door contract to improve realty. Because the reasons for our conclusions lie in the history of differing regulations of door-to-door selling, we must first present that review before addressing the questions presented.

I

"Unsolicited door-to-[door] sales, also called home solicitation sales, have long been regarded as targets of con-

sumer reform. This is so because unwary consumers are particularly vulnerable to high pressure sales tactics, first outside on the doorstep and then inside the house, at a time when they do not have the benefit of competitive shopping and thus may be unaware of the retail price for the same or comparable merchandise. In addition, many of the people whom door-to-door sellers find at home, such as the elderly and the poor, are the ones least able to resist this sales approach."

1 H. Alperin & R. Chase, *Consumer Law: Sales Practices and Credit Regulation* § 78, at 101 (1986).

The common feature of a consumer protection statute directed at home solicitation sales is the consumer's right to cancel within a "cooling off" period. That period is a number of days after the contract to sell is made. During that period the buyer's right to cancel is absolute. It may be exercised simply because the buyer has a change of mind about making the purchase. Typically home solicitation sales acts will define covered transactions, create the substantive right of unilateral cancellation, require disclosure of that right, describe how the right is to be exercised, and provide the duties of buyer and of seller where an effective notice of cancellation has been given. As we shall see, some home solicitation sales regulations specify special consequences enlarging the right of cancellation where the seller fails to disclose the right of cancellation. Other regulations do not.

The National Conference of Commissioners on Uniform State Laws (NCCUSL) proposed a home solicitation sales act as part of the 1968 text of its proposed Uniform Consumer Credit Code (U3C–68). Maryland, by Chapter 578 of the Acts of 1970, adopted such an act (MD–70) which was closely patterned on the U3C–68. MD–70 was codified in Md.Code (1957, 1969 Repl.Vol., 1970 Cum.Supp.), Art. 83, "Sales and Notices," §§ 28 through 35. Review of this now repealed statute will illustrate one form of home solicitation sales act.

Section 28 of MD–70 defined a home solicitation sale as "a consumer credit sale of goods ... or services in which the seller ... engages in a personal solicitation of the sale at a residence of the buyer and the buyer's agreement or offer to purchase is there given...." Sales pursuant to pre-existing revolving charge accounts or pursuant to prior negotiations at the seller's place of business were excluded. To that extent § 28 tracked U3C–68, § 2.501. But § 28 also excluded "a sale initiated by a buyer," so that, were MD–70 still in effect, the transaction presented in this case would not be covered by that statute.

Section 29(1) of MD–70 conferred the right of cancellation, exercisable "until midnight of the third business day after the day on which the buyer signs an agreement or offer to purchase which complies with this subheading." Cancellation was effected when the buyer gave written notice at the seller's address stated in the agreement, or, if by mail, when deposited. § 29(2) and (3). The notice was "sufficient if it indicate[d] by any form of written expression the intention of the buyer not to be bound by the home solicitation sale." § 29(4). MD–70, § 29(1) to (5) tracked U3C–68, § 2.502(1) to (5).

Section 30 of MD–70 required a written contract and that it contain a statutorily specified notice of the right to cancel. If the buyer cancelled, the seller was required to tender, within ten days, a refund of any payments made. § 31. If goods had been delivered, there were provisions for return of goods following cancellation by the buyer to the seller. § 32. These provisions tracked U3C–68, §§ 2.503(1) and (2), 2.504 and 2.505(1) and (2).

MD–70 also addressed the consequences of a failure to give the notice by a door-to-door seller who nevertheless commenced performance or performed. In MD–70, § 30(3) [U3C–68, § 2.503(3)] it was provided:

"Until the seller has complied with this section the buyer may cancel the home solicitation sale by notifying

the seller in any manner and by any means of his intention to cancel."

MD–70, § 32(3) [U3C–68, § 2.505(3)] further provided:

"If the seller has performed any services pursuant to a home solicitation sale prior to its cancellation, the seller is entitled to no compensation except the cancellation fee provided in this subheading."

Thus, under MD–70, if the seller in a covered transaction failed to give the required notice of the right to cancel, the right to cancel continued "[u]ntil" the seller complied.[1]

In September 1970 the Federal Trade Commission (FTC) initiated a proceeding for the promulgation of a trade regulation rule, pursuant to the Federal Trade Commission Act, 15 U.S.C. § 41, *et seq.*, concerning a cooling-off period for door-to-door sales. 35 Fed.Reg. 15,164 (1970). There followed a period for public comment on the original proposal and on a revision of February 17, 1972. 37 Fed.Reg. 3551 (1972). The FTC promulgated its rule in final form on October 18, 1972, but due to a then pending challenge to the rulemaking power of the FTC, no effective date was announced at that time. 37 Fed.Reg. 22,934, 22,961 (1972). It was announced on December 7, 1973, that the effective date of the rule would be June 7, 1974. 38 Fed.Reg. 33,766 (1973). The current rule is codified at 16 C.F.R. § 429.1 (1992) (the FTC Rule).

The FTC Rule declares certain acts and omissions to be unfair and deceptive acts or practices on the part of a seller. These include:

---

1. MD–70 included an additional section, § 34, not found in U3C–68, which excepted the solicitation or sale of insurance from the operation of the statute. The CPD points to an amendment which was temporarily attached to § 34 in the Maryland Senate, but which was excised before enactment. The amendment would have excluded from the coverage of MD–70 sales subject to the jurisdiction of the Maryland Home Improvement Commission. The CPD supplements the bare facts reflected by the session law with newspaper clippings describing the amendment and its deletion. Because MD–70 is not the controlling statute in this case, we need not discuss that amendment or the additional descriptive material.

• Failure to furnish the buyer with a receipt or copy of the contract containing a specified form of notice of cancellation in at least ten point, bold-face type, placed in immediate proximity to the space reserved for the buyer's signature (§ 429.1(a));

• Failure to furnish the buyer at the time of signing with a completed form, in duplicate, which is the "notice of cancellation" and which describes, consistently with the Rule's mandate, the right of cancellation in ten point bold-face type. The FTC Rule contemplates that the buyer may use this form to exercise the right of cancellation, by dating and signing it, and that the buyer thereafter will retain the second copy (§ 429.1(b));

• Failure to complete both copies of the "notice of cancellation" by entering the seller's name, address, date of transaction, "and the date, not earlier than the third business day following the date of the transaction, by which the buyer may give notice of cancellation" (§ 429.-1(c));

• Failure orally to inform each buyer of the right to cancel (§ 429.1(e)); and

• Misrepresentation in any manner of the buyer's right to cancel (§ 429.1(f)).

Other subsections of § 429.1 deal with the seller's duties on cancellation.

Under the FTC Rule a door-to-door sale is

"[a] sale, lease, or rental of consumer goods or services with a purchase price of $25 or more ... in which the seller or his representative personally solicits the sale, including those in response to or following an invitation by the buyer, and the buyer's agreement or offer to purchase is made at a place other than the place of business of the seller."

16 C.F.R. § 429.1, Note 1(a). There follow six exclusions from this definition. The FTC Rule provides that it preempts "directly inconsistent" state laws. 16 C.F.R. § 429.1, Note 2(b).

The FTC Rule does not provide any special sanctions or remedies, other than those generally applicable to unfair and deceptive acts or practices under the Federal Trade Commission Act.

Under the FTC Rule a seller of consumer goods or services who goes to the buyer's home in response to the buyer's invitation can become a door-to-door seller. Thus, businesspersons who intended to be, or who might become, door-to-door sellers had to comply with the federal law which, in Maryland and in many other states, was superimposed on pre-existing state or local law. These businesspersons had to determine what portion of state or local law was preempted by federal law and had to prepare contracts that complied with federal law and any non-preempted state or local law. The resulting practical problems are illustrated by opinion letters of the FTC. *See, e.g.,* 87 FTC 1444 (1976); 85 FTC 1215 (1975). One commentator, after discussing a FTC advisory opinion of June 12, 1975, Consumer Cred. Guide (CCH) ¶ 98,583, opines:

> "This FTC Advisory Opinion illustrates the futility of state legislation in an area occupied by federal law. Since FTC Trade Regulation Rules are now clearly authorized by the Federal Trade Commission Improvement Act and preempt conflicting state law, the chance for conflict is great. A state might be well advised to draft its statute word-for-word after the [FTC Rule]. Or a state statute could simply provide that violation of any FTC Rule constitutes a deceptive trade practice under *state* law. Otherwise, the state statutes which gave birth to the FTC Rule will find themselves preempted by it. Such is the irony of the new federalism which marks consumer credit law!"

1 J. Fonseca, *Handling Consumer Credit Cases* § 2:14, at 63 (3d ed. 1986).

In response to the above-described concerns, the Maryland General Assembly repealed MD–70 and enacted a new home solicitation sales statute by Chapter 753 of the Acts of 1974. The statute was patterned after the FTC Rule. 1975

Md.Laws ch. 49, at 560, Revisor's Note to § 14–301(d). Chapter 753 was amended in the course of passage to make its effective date the same as the effective date of the FTC Rule, June 7, 1974. 1974 Md.Laws ch. 753, § 3. The enactment was originally codified in former Art. 83. As part of Code Revision, the new statute was restyled, and it was retitled "Door–to–Door Sales," by Chapter 49 of the Acts of 1975. The statute (MD–74) is now codified as Md.Code (1975, 1990 Repl.Vol.), §§ 14–301 through 14–306 of the Commercial Law Article (CL). Later amendments to MD–74 are not relevant to the issues here.

Sections 14–301 and 14–302 of MD–74 are, in every material respect and clearly without any direct inconsistency, the FTC Rule. Section 14–301 defines "business day," "consumer goods," "consumer services," "place of business," "purchase price," and "door-to-door sale" as those terms are defined in the FTC Rule. The definition in § 14–301(d) of "door-to-door sale" includes the same six exclusions found in the FTC Rule's definition of door-to-door sale.[2]

Section 14–302 of MD–74 is set forth in the margin.[3] That section makes the acts or omissions that are prohibited

---

**2.** The exclusion for emergencies in § 14–301(d)(2)(iii) also adds, in relation to the FTC Rule, that "the seller in good faith makes a substantial beginning of the performance of the contract."

**3.** Section 14–302 reads in its entirety:

"It is an unfair or deceptive trade practice within the meaning of Title 13 of this article for a seller to:

(1) Fail to furnish the buyer with:

(i) A fully completed receipt or copy of any contract which pertains to a door-to-door sale at the time of its execution, which is in the same language as that principally used in the oral sales presentation, shows the date of the transaction, and contains the name and address of the seller; and

(ii) A statement which is in immediate proximity to the space reserved in the contract for the signature of the buyer or, if a contract is not used, is on the front page of the receipt and which, in boldface type of a minimum size of 10 points, is in substantially the following form:

'You, the buyer, may cancel this transaction at any time prior to midnight of the third business day after the date of this transaction.

See the attached notice of cancellation form for an explanation of this right.';

(2) Fail to furnish the buyer, at the time he signs the door-to-door sales contract or otherwise agrees to buy consumer goods or consumer services from the seller, a completed form in duplicate, captioned 'Notice of Cancellation', which:

(i) Is attached to the contract or receipt and is easily detachable; and

(ii) Contains in 10 point boldface type the following information and statements, in the same language as that used in the contract:

'Notice of Cancellation

(Enter date of transaction)

_____
(Date)

You may cancel this transaction, without any penalty or obligation, within three business days from the above date.

If you cancel, any property traded in, any payments made by you under the contract or sale, and any negotiable instrument executed by you will be returned within 10 business days following receipt by the seller of your cancellation notice, and any security interest arising out of the transaction will be cancelled.

If you cancel, you must make available to the seller at your residence, in substantially as good condition as when received, any goods delivered to you under this contract or sale; or you may, if you wish, comply with the instructions of the seller regarding the return shipment of the goods at the seller's expense and risk.

If you do make the goods available to the seller and the seller does not pick them up within 20 days of the date of your notice of cancellation, you may retain or dispose of the goods without any further obligation. If you fail to make the goods available to the seller, or if you agree to return the goods to the seller and fail to do so, then you remain liable for performance of all obligations under the contract.

To cancel this transaction, mail or deliver a signed and dated copy of this cancellation notice or any other written notice, or send a telegram, to

(name of seller) (address of seller's place of business)

_____, at _____

not later than midnight of _____
(date)

I hereby cancel this transaction.

_____
(date)

_____
(Buyer's signature)';

(3) Fail, before furnishing copies of the 'Notice of Cancellation' to the buyer, to complete both copies by entering the name of the seller, the address of the seller's place of business, the date of the transaction, and the date, not earlier than the third business day following the date of the transaction, by which the buyer may give notice of cancellation;

(4) Include in any door-to-door sales contract or receipt any confession of judgment or waiver of any of the rights to which the

by the FTC Rule unfair or deceptive trade practices within the meaning of CL Title 13, the Consumer Protection Act. Section 14–302 provides the same right of cancellation, within three business days from the date of transaction, as

buyer is entitled under this section, including specifically his right to cancel the sale in accordance with the provisions of this section;

(5) Fail to inform the buyer orally, at the time he signs the contract or purchases the consumer goods or consumer services, of his right to cancel;

(6) Misrepresent in any manner the buyer's right to cancel;

(7) Fail or refuse to honor any valid notice of cancellation by a buyer and, within 10 business days after the receipt of that notice, to:

(i) Refund all payments made under the contract or sale;

(ii) Return, in substantially as good condition as when received by the seller, any goods or property traded in;

(iii) Cancel and return any negotiable instrument executed by the buyer in connection with the contract or sale and take any action necessary or appropriate to terminate promptly any security interest created in the transaction;

(8) Negotiate, transfer, sell, or assign any note or other evidence of indebtedness to a finance company or other third party before midnight of the fifth business day following the day the contract was signed or the consumer goods or consumer services were purchased;

(9) Fail, within 10 business days of receiving a buyer's notice of cancellation, to notify him whether the seller intends to repossess or to abandon any shipped or delivered goods;

(10) Solicit a sale or order for sale of goods or services at the residence of a prospective buyer, without clearly, affirmatively and expressly revealing at the time the person initially contacts the prospective buyer, and before making any other statement, except a greeting, or asking the prospective buyer any other questions:

(i) The identity of the person making the solicitation.

(ii) The trade name of the person represented by the person making the solicitation.

(iii) The kind of goods or services being offered.

(iv) And, the person making the solicitation shall, in addition to meeting the requirements of paragraphs (i), (ii), and (iii), show and display identification which states the information required by paragraphs (i) and (ii) as well as the address of the place of business of one of the persons identified; or

(11) To use any plan, scheme, or ruse in soliciting a sale or order for the sale of goods or services at the residence of a prospective buyer, which misrepresents the solicitor's true status or mission for the purpose of making the sale or order for the sale of goods or services."

Subsections 10 and 11 were added by Chapter 156 of the Acts of 1976.

the FTC Rule. The short forms of disclosure are identical in the two regulations. The long form notices of cancellation are identical. As does the FTC Rule, § 14–302 requires the seller to tell the buyer that "[t]o cancel this transaction, mail or deliver a signed and dated copy of this cancellation notice or any other written notice, or send a telegram, to [seller] at [address of seller's place of business] not later than midnight of [the third business day from the date of the transaction]."

MD–74 contains four sections which are not contained in the FTC Rule. Section 14–303, on which Crystal relies, reads:

"If the seller violates any provision of § 14–302 of this subtitle, the buyer may cancel the door-to-door sale by notifying the seller in any manner and by any means of his intention to cancel."

Liability "for all damages proximately caused by the violation and for reasonable attorney fees" is imposed by § 14–304. A criminal penalty of a fine of up to $1,000, or imprisonment for up to one year, or both, is provided by § 14–305. Section 14–306 is the short title of the statute.

## II

Crystal submits, and West & Callahan denies, that home improvement transactions are subject to MD–74.

■ A sale of consumer goods or of consumer services, with a purchase price of $25 or more, which meets the other elements of CL § 14–301(d) is a door-to-door sale unless excluded by the specified exceptions. Here the seller's performance of the contract involves both goods and services. Both aspects of this mixed contract are for household purposes, and therefore, for consumer purposes. CL § 14–301(c)(1). Unlike questions concerning the applicability to a mixed contract of warranties on sales of goods under the Uniform Commercial Code, it is unnecessary here to determine this contract's predominant purpose, because both goods and services are covered by MD–74. *Compare An-*

*thony Pools v. Sheehan,* 295 Md. 285, 455 A.2d 434 (1983); *Burton v. Artery Co.,* 279 Md. 94, 367 A.2d 935 (1977); *DeGroft v. Lancaster Silo Co.,* 72 Md.App. 154, 527 A.2d 1316 (1987); *and Coakley & Williams, Inc. v. Shatterproof Glass Corp.,* 778 F.2d 196 (4th Cir.1985) (applying Maryland law), *cert. denied,* 475 U.S. 1121, 106 S.Ct. 1640, 90 L.Ed.2d 185 (1986).

There is no exemption in MD–74 for transactions subject to regulation under the Maryland Home–Improvement Law, Md.Code (1957, 1988 Repl.Vol.), Art. 56, §§ 245 through 269A.

One of the exceptions carved from the definition of a door-to-door sale under MD–74 is a transaction that "pertains to the sale ... of real property." CL § 14–301(d)(2)(vi). One court has held that the installation of aluminum siding is not within the Ohio home solicitation sales act because the goods become part of the realty. *Tambur's, Inc. v. Hiltner,* 55 Ohio App.2d 90, 379 N.E.2d 231 (1977). Even though the consumer goods to be furnished and consumer services to be rendered under the contract now before us result in an improvement to realty, this transaction is not within the real estate exemption. That exemption in Maryland is the same as the sixth exemption under the FTC Rule. In promulgating the Rule on October 18, 1972, the FTC also published a "Statement of Basis and Purpose." 37 Fed.Reg. at 22,935–61. Chapter X.K of that statement discusses the sale of realty exception, saying: "With regard to the real property provision, it is emphasized that it is not intended to apply to the sale of goods or services such as siding, home improvements, and driveway and roof repairs." 37 Fed.Reg. at 22,949. By intentionally conforming CL §§ 14–301 and 14–302 to the FTC Rule, the General Assembly necessarily intended the exemption for real estate to be construed in the same manner as the comparable federal language is construed.

■ We hold that home improvement transactions are not excluded from the Maryland Door–to–Door Sales Act.

**334**

III

A

 Crystal maintains that her right to cancel continued to be viable when it was exercised during the litigation between the parties, because West & Callahan never gave her the required notice of the right to cancel. The CPD, as amicus, joins Crystal in that contention, asserting that the consumer has the right to cancel at any time up to three business days after receipt of a notice of cancellation conforming to the statute. For a host of reasons, we do not agree.

The concept of an unending right of cancellation, absent notice by the seller, was considered and rejected by the FTC. Consequently, it forms no part of the right of cancellation embodied in §§ 14–301 and 14–302 of MD–74. The FTC Statement of Basis and Purpose discusses in Chapter XI.M a *"[p]roposal for penalizing seller for noncompliance."* 37 Fed.Reg. at 22,957. The National Consumer Law Center had recommended to the FTC an amendment to its proposed rule under which "the cooling-off period would not commence until the consumer had been given the required notice." *Id.* (footnote omitted).[4] In declining indefinitely to enlarge the cooling off period, the FTC concluded that it was unnecessary to incorporate "a remedy or punishment" in the rule, because failure to comply with the rule would engage the enforcement gears of the FTC. *Id.* Failure to disclose the right of cancellation similarly is enforced under MD–74 by, *inter alia,* administrative reme-

---

4. The National Consumer Law Center, an organization headquartered in Boston, Massachusetts, had proposed its own "Model Consumer Credit Act" (1973), which had a unique approach to home solicitation sales. In lieu of a right to cancel an otherwise legally binding contract during the cooling-off period, that model act provided that "the consumer is not obligated ... until he has approved the transaction." Approval was accomplished "when the consumer mails written notice of approval to the creditor." National Consumer Law Center, Model Consumer Credit Act, § 2.703(1) and (3) (1973).

dies for deceptive practices under the Consumer Protection Act.

Had the General Assembly intended the right of cancellation in MD–74 to run on indefinitely, until the seller, if ever, gave notice of the right of cancellation, there was language in U3C–68, § 2.503(3) for accomplishing that result ("Until the seller has complied with this section the buyer may cancel the home solicitation sale by notifying the seller in any manner and by any means of his intention to cancel.").

A problem with the above-quoted language of § 2.503(3) was pointed out by the consultant on door-to-door sales to the Special Committee on Retail Installment Sales, Consumer Credit, Small Loans and Usury of the NCCUSL. Sher, *The "Cooling–Off" Period in Door–to–Door Sales*, 15 UCLA L.Rev. 717, 717 n. * (1968). Referring, *inter alia*, to a tentative draft of U3C–68 which contained the ultimately adopted text of § 2.503(3), Sher noted:

"Although the buyer's right to cancel under these statutes continues until the seller delivers the required document, it will not extend beyond that time if the 'normal' cooling-off period has expired when the document is delivered. Thus, if the seller delays performing this obligation until the end of the cooling-off period ... the buyer will not have the document advising him of his rights during the cooling-off period, and his right to cancel will terminate immediately upon delivery of that document. The Massachusetts and U.C.C.C. provisions would be more effective, therefore, if they extended the buyer's right to cancel for a period equal to the cooling-off period, commencing with delivery of the required document, no matter how long delayed."

15 UCLA L.Rev. at 781.

The NCCUSL did not change the text of § 2.503(3). In U3C–74 the Commissioners did add a comment following the same section, then renumbered § 3.503(3). The comment states that "[t]he 3–day period for cancellation does

not begin to run until the buyer signs a written agreement or offer to purchase complying with this section." [5]

Thus, when the General Assembly adopted MD–74, the "until" language of U3C–74, § 3.503(3), without benefit of the comment, had been § 2.503(3) of U3C–68. The same language had been § 30(3) of MD–70. Nevertheless, the General Assembly did not carry the "until" standard forward into MD–74.

The CPD cites a number of cases to support a continuing right of cancellation, but all of these cases, save one, are distinguishable. They apply statutes which follow the U3C model under which the right runs expressly "until" the seller complies. The CPD's lead citation is to *Brown v. Jacob*, 183 Mich.App. 387, 454 N.W.2d 226 (1990). The Michigan intermediate appellate court apparently would have allowed the buyer to cancel after suit by the seller to recover the balance of the price for home repairs. The Michigan Supreme Court reversed and adopted as its opinion the dissenting opinion in the intermediate appellate court, on the issue of who, between buyer and seller, solicited whom. *Brown v. Jacob*, 439 Mich. 862, 476 N.W.2d 156 (1991). In any event, Michigan Comp.Laws Ann. § 445.113(4) (West 1989) provides that "[u]ntil the seller has complied with this section, the buyer may cancel the home solicitation sale by notifying the seller in any manner and by any means of his or her intention to cancel."

*Warren v. Borger*, 184 Ill.App.3d 38, 132 Ill.Dec. 478, 539 N.E.2d 1284, *appeal denied*, 127 Ill.2d 643, 136 Ill.Dec. 610, 545 N.E.2d 134 (1989), involved multiple defendants who had purchased memberships in a camping resort between February 1980 and June 1983. They cancelled when sued by the resort promoter for balances due on the installment contracts. The court quoted Ill.Rev.Stat.1979, ch. 121½, ¶ 262B which provided that " '[t]he 3 day period provided

---

**5.** We shall see below that some states have added the language of the comment following U3C–74, § 3.503(3) to the body of the text of that state's enactment of the "until" language.

for in this section does not commence until the Notice of Cancellation * * *.' " 132 Ill.Dec. at 481, 539 N.E.2d at 1287.[6]

A trial court decision, *Hollywood Decorators, Inc. v. Lancet*, 118 Misc.2d 1096, 461 N.Y.S.2d 955 (1983), is cited by the CPD. There the buyers executed an interior decorating contract on May 12, 1982. Required disclosures were not made. The buyers sought to cancel by telephone on May 14 and, through their attorney, in writing on May 26. The New York statute which the court applied could not be more explicit. It reads:

"Until the seller has complied with this section, the buyer . . . may cancel the door-to-door sale by notifying the seller in any manner and by any means of his intention to cancel. The period prescribed by subdivision one of section four hundred twenty-seven [the three day cooling off period] shall begin to run from the time the seller complies with this section."

New York Pers.Prop.Law § 428.2 (McKinney 1976 & Supp. 1992).

There are other decisions referring to an on-going right of cancellation, pending the giving of disclosures, but these decisions similarly reflect the text of the applicable statute. *See, e.g., Cole v. Lovett*, 672 F.Supp. 947 (S.D.Miss.), *aff'd without opinion*, 833 F.2d 1008 (5th Cir.1987) (applying Chapter 66 of the Mississippi Code[7]); *Weatherall Aluminum Prods. Co. v. Scott*, 71 Cal.App.3d 245, 139 Cal.Rptr.

---

**6.** *Warren v. Borger, supra*, was decided by the Fifth District of the Appellate Court of Illinois. Under the same statutory language the Fourth District, Appellate Court of Illinois, has held that where the homeowner cancelled after siding had been affixed to the home, based upon lack of disclosure, the buyer must tender to the seller the reasonable value of the siding which could not be returned in its original condition. *Hurlbert v. Cottier*, 56 Ill.App.3d 893, 14 Ill.Dec. 538, 372 N.E.2d 734 (1978).

**7.** Mississippi Code Ann. § 75–66–5(4) (1991) reads:
"Until the seller has complied with this section, the buyer may cancel the home solicitation sale by notifying the seller in any manner and by any means of his intention to cancel."

329 (1977) (applying California Civ.Code Ann. § 1689.5 *et seq.*[8]); *Bruntaeger v. Zeller,* 147 Vt. 247, 515 A.2d 123 (1986) (applying Vermont Stat.Ann. tit. 9, §§ 2451 through 2462 [9]).

The only decision cited by Crystal and the CPD that adopts their position, without the support of statutory language similar to that set forth above, is by a trial court in New Jersey, *Swiss v. Williams,* 184 N.J.Super. 243, 445 A.2d 486 (Dist.Ct. Mercer Co.), *overruled on other grounds, Skeer v. EMK Motors,* 187 N.J.Super. 465, 455 A.2d 508 (App.Div.1982). It applies the New Jersey Door-to-Door Home Repair Sales Act of 1968, New Jersey Stat. Ann. § 17:16C–95 *et seq.* Absent express language in the statute, and relying only on a legislative directive for liberal construction, the court held the act to confer "a continuing right to rescind until such time as the home repair contractor complies with the statutory requirements of providing [the buyer] with a receipt complying with the format specified in the act. The three-day notification period for rescission does not begin to run against the homeowner until such a receipt is received." 445 A.2d at 489–90. The decision strikes us as crossing the line separating judicial construction from judicial legislation.

Crystal and the CPD submit that CL § 14–303 causes the right to cancel in Maryland to run on until notice is given ("If the seller violates any provision of § 14–302 of this subtitle, the buyer may cancel the door-to-door sale by notifying the seller in any manner and by any means of his intention to cancel."). Section 14–303 does not address the

---

**8.** California Civ.Code Ann. § 1689.7(e) (West 1985) reads:
"Until the seller has complied with this section the buyer may cancel the home solicitation contract or offer."

**9.** Vermont Stat.Ann. tit. 9, § 2454(b)(3) (1984) reads:
"Until the seller has complied with this subsection, the consumer ... may cancel the home solicitation sale by notifying the seller in any manner and by any means of his intention to cancel. The cancellation period of three business days shall begin to run from the time the seller complies with this subsection."

duration of the right at all, an omission that becomes more striking when § 14–302 is compared to the predecessor statute, MD–70, § 30(3), a species of the "until" genus, reviewed above. Literally, CL § 14–303 addresses the way in which the right to cancel is exercised. Under CL § 14–302, in order to exercise the cancellation right, the buyer must "mail or deliver a signed and dated copy of [the seller-completed] cancellation notice or any other written notice, or send a telegram." What § 14–303 *says* is that these limitations on means and manner are relaxed if the seller violates § 14–302. As a result, the buyer may fail to sign the cancellation, fail to date it, and, perhaps most importantly, the buyer may cancel orally. *Compare Eastern Roofing & Aluminum Co. v. Brock,* 70 N.C.App. 431, 320 S.E.2d 22, 24 (1984) (buyers who acted "[w]ithin apt time" permitted orally to cancel where disclosures of right of cancellation did not conform to statute).

Crystal and the CPD also argue that the beginning of the running of the cooling-off period cannot commence until the buyer is advised of the existence of the right, through the required notices from the seller. But the argument does not mesh with the terms of § 14–303. That section's operation is not limited to the failure to give notice; rather, it embraces any violation of § 14–302. Thus, under Crystal's argument, the right to cancel would run on, into perpetuity, if the seller gave the short form written notice on the contract above the signature line and gave, in duplicate, the long form notice of cancellation, but, according to testimony accepted by the trier of fact, the seller failed to give the oral disclosure of the right to cancel as well. Under Crystal's argument, if all written and oral disclosures were given when required, but one of the written disclosures was in eleven point type, the right to cancel would run in perpetuity.

For all of these reasons we hold that under MD–74 the right to cancel does not run, as of right, until disclosures complying with CL § 14–302 are given to the buyer by the seller.

■■■■■■■■■■■■■■■■■

## B

Two possible constructions of MD–74, concerning the duration of the right to cancel, remain. The first is that the right expires if it is not exercised by midnight of the third business day following the date of the transaction. That construction would apply the life-span of the right as described in CL § 14–302(2). That is the way in which the FTC Rule operates. This construction, however, gives no effect to the requirements that the consumer be advised, in writing and orally, of the right to rescind. Under this construction there is no difference in the duration of the consumer's right between transactions in which the required disclosures have been given and those transactions in which the required disclosures have not been given. That is not consistent with the legislative purpose in enacting MD–74.

■■ The other possible construction concerning the duration of the right is that, where the seller fails to make the required disclosures, the right runs for a reasonable time. *See Community Nat'l Bank & Trust Co. v. McClammy,* 138 A.D.2d 339, 525 N.Y.S.2d 629, 632 (1988). This approach distinguishes between transactions in which disclosure was made contemporaneously, and those in which it was not. In the former situation the statute clearly limits the life of the right to three business days, but in the latter there is no express statutory delineation of the life of the right. Absent any clear legislative direction as to the duration of the right where the seller has failed to make the required disclosures, it is a traditional exercise of judicial power to fill the statutory interstices by implying a reasonable time within which to act. Implying a reasonable time gives effect to the requirement that disclosures be made while avoiding the injustices and potential absurdity of a perpetual right to cancel. We hold that where the seller fails to give the disclosures of the right to cancel required by MD–74, the right to cancel runs for a reasonable time.

■ Based upon the fact-findings of the trial judge, Crystal, as a matter of law, did not exercise the right of rescission within a reasonable time. The reasonableness of the time depends upon all of the circumstances. In the instant matter these include the fact that disclosure of the right was not made and that the purpose of MD–74 is to provide a "cooling-off" period, after the contract is made and after the salesperson has left the presence of the consumer.

The following excerpts from the trial judge's findings sufficiently paint the picture here.

· "[E]ven as late as the argument a few minutes ago I'm still trying to figure out what it is [Ms. Crystal] wants to satisfy her. And I don't know. And if I don't know then I can hardly say to Mr. Callahan, 'You obviously didn't do what you were supposed to do.' It may be obvious to her, but if it's not to me then I can hardly say to Mr. Callahan, 'You should have known what she wanted.' "

· "[Ms. Crystal] was not in constant supervision, but certainly aware of what was going on and instead of stopping the activities she requested more activities from them. Whether they were in the way of modifications, additions, improvements, is beside the point. The exact opposite conduct was being exhibited to these people[, West & Callahan,] from dissatisfaction."

· "If [Ms. Crystal] didn't affirmatively [pick out the paint colors,] she acquiesced in it, and you cannot sit idly by, watch somebody paint a room, or a floor, or stain it, and then say, 'That's not what I wanted, I'm not paying for it.' That's just not fair dealing. And that's really what it was all about."

· "Ms. Crystal has paid nobody for the work and materials that are on her property and if she were to die tomorrow the value of [that] work and materials would go to somebody else. Now that's not right."

Fairness is also a factor in determining the reasonableness of time. The circuit court found that the reasonable value of the work done was equal to the amount billed.

Given the absence of any defects in the work, as found by the trial court, coupled with the findings of acquiescence, the delay of more than one and one-half years from the completion of the work to the attempted exercise of the right of cancellation under MD-74 is an unreasonable delay. Thus, Crystal's right of cancellation was no longer viable when she attempted to exercise it.

## IV

■ Crystal argues that the court's award of prejudgment interest from May 1, 1989, was improper for two reasons. First, she argues that the court's failure to set a rate for prejudgment interest is fatal because it "makes the award impossible to calculate." West & Callahan respond that the rate should be set at ten percent according to Md.Code (1974, 1989 Repl.Vol.), § 11–107(a) of the Courts and Judicial Proceedings Article. Both are incorrect. Failure to set the rate of interest simply means that the rate runs at the legal rate. Absent statute, the legal rate of prejudgment interest is equal to the general legal rate of six percent. *Maryland Nat'l Bank v. Cummins*, 322 Md. 570, 599–600, 588 A.2d 1205, 1219 (1991); *see First Virginia Bank v. Settles*, 322 Md. 555, 566, 588 A.2d 803, 808 (1991); *Travel Committee, Inc. v. Pan Am. World Airways*, 91 Md.App. 123, 189, 603 A.2d 1301, 1333–34, *cert. denied*, 327 Md. 525, 610 A.2d 797 (1992); Md. Const. art. III, § 57. The ten percent rate set in § 11–107(a) applies to postjudgment interest.

Crystal also argues that any award of prejudgment interest was improper here because "[w]here the damages are unliquidated the general rule is that interest runs [from] the date of judgment." Appellant's Brief at 21–22; *see Taylor v. Wahby*, 271 Md. 101, 113, 314 A.2d 100, 106 (1974); *Wartzman v. Hightower Productions, Ltd.*, 53 Md. App. 656, 668–69, 456 A.2d 82, 89, *cert. denied*, 296 Md. 112 (1983).

■ An award of prejudgment interest is within the discretion of the finder of fact. *David Sloane, Inc. v. Stanley G. House & Assocs.*, 311 Md. 36, 53, 532 A.2d 694, 702 (1987); *I.W. Berman Properties v. Porter Bros.*, 276 Md. 1, 18, 344 A.2d 65, 75 (1975); *Knowles v. Mutual Life Ins. Co.*, 788 F.2d 1038, 1041 (4th Cir.), *cert. denied*, 479 U.S. 948, 107 S.Ct. 433, 93 L.Ed.2d 383 (1986). The trial judge stated his reasons for awarding prejudgment interest as follows:

> "In this case because there was no evidence of any effort from the beginning to say, 'Yeah, you haven't done this right, but 50% of it is done right, I'll pay you 50%, we'll argue about the rest later'—no offer as far [as] I can see from the evidence, to meet the man half way when he's paid for eight thousand, or more windows, and she's working on his money, certainly if I ever saw a case where the person's entitled to prejudgment interest it is this one."

This rationale squares with *Berman Properties*, where we said that the trial judge, when considering whether prejudgment interest was warranted, legitimately considered the debtor's refusal to tender the amount concededly owed on a contract. 276 Md. at 20, 344 A.2d at 77.

■ Moreover, the rule that Crystal cites—that prejudgment interest is not allowed on unliquidated claims—derives generally from tort cases such as *Taylor* and *Wartzman*. The ordinary rule in contract cases, if the contract requires payment of a sum certain on a date certain, is the opposite—prejudgment interest typically is allowed as a matter of right. *Affiliated Distillers Brands Corp. v. R.W.L. Wine & Liquor Co.*, 213 Md. 509, 519, 132 A.2d 582, 587 (1957); *Travel Committee*, 91 Md.App. at 188, 603 A.2d at 1333; *see* Restatement (Second) of Contracts § 354(1) (1981). Where a contract case is somewhere in between, such as this one, the question of whether to award prejudgment interest is well within the discretion of the finder of fact. The award of prejudgment interest sustained in *Berman Properties* was much like this award.

There the claims arose out of related construction contracts in which the contractor was to be paid costs plus fixed fees, and the owner unsuccessfully claimed that the total, combined payments of costs and fees had been capped. Moreover, here, the fact that Crystal's own expert believed that West & Callahan charged a fair price for the work, combined with the fact that the contractor submitted detailed bills for time and materials, is enough to conclude that the trial judge did not abuse his discretion.

*JUDGMENT OF THE CIRCUIT COURT FOR CAROLINE COUNTY AFFIRMED. COSTS TO BE PAID BY APPELLANT.*

ROBERT M. BELL, J., concurs and dissents and files an opinion in which ELDRIDGE and CHASANOW, JJ., join.

ROBERT M. BELL, Judge, concurring and dissenting.

I agree with the majority's holding, in part I of its opinion, that home improvement transactions fall within the meaning of "consumer goods" or "consumer services", and meet all of the other elements of the Door–to–Door Sales Act, *see* Maryland Code (1975, 1990 Repl.Vol.), § 14–301 of the Commercial Law Article and, thus, are included within that Act. Op. at 332–33. On the other hand, I have a somewhat different interpretation of the operation of § 14–303 than the majority's interpretation, as reflected in part III B. Therefore, while I concur in part I of the opinion, I note my dissent from part III. Given the view I take of § 14–303, I would not reach the issue discussed in part IV, the right of the appellee to prejudgment interest.

The majority is correct, of course, § 14–303 [1] does not expressly provide that the right to cancel accrues when the buyer is advised of it or prescribe the precise period for which the right to cancel continues when the seller fails to

---

1. That section provides:
 If the seller violates any provision of section 14–302 of this subtitle, the buyer may cancel the door-to-door sale by notifying the seller in any manner and by any means of his intention to cancel.

inform the buyer of the right. To that extent, then, the majority quite properly observes: "[l]iterally, CL § 14–303 addresses the way in which the right to cancel is exercised." Op. at 338–39. Nevertheless, it cannot be gainsaid that the Legislature did intend for the cooling off period, *i.e.*, the buyer's right to cancel, to have meaning. Why else would the Legislature painstakingly provide not only for the buyer's notification but, in addition, the precise form of that notice? Undoubtedly, the Legislature recognized that, without knowledge of the right to cancel, a consumer will not be able meaningfully to exercise it. Until the buyer is told that he or she may cancel, or receives information from another source, the Legislature logically could assume that the right to cancel that it was giving the buyer was nothing more than an empty promise. We do not ascribe to the Legislature an intention that overlooks reality.

I agree with the majority's reluctance, indeed, refusal, to construe the statute as providing, premised only upon the failure of the seller to provide the buyer with the notice the statute requires, for a perpetual right to cancel on the part of a buyer. The seller's omission to give notice need not be, however, the only trigger for cancellation. In my opinion, the key question is at what point did the consumer become aware, or should have, that he or she had a right to cancel the contract? A consumer who is aware that he or she has the right to cancel, notwithstanding the seller's non-compliance with § 14–302, but does not do so in order to increase the benefit he or she will receive as a result of the seller's performance of the contract, which the consumer intends ultimately to reject, should not be allowed to cancel the contract for even a reasonable time following a formal notification by the seller. That consumer should be deemed consciously to have foregone that right. The purpose of requiring that the consumer be informed of the right to cancel is to ensure that a consumer who otherwise would not have it, has knowledge that, for a certain period of time, he or she may cancel a contract he or she has entered into for any, or even no, reason.

The right of cancellation, being part and parcel of a cooling off period, may be exercised, as indicated, for any reason, or for no reason. As the majority recognizes, the cooling off period was engrafted into the law in order to protect the consumer who does not react well to pressure selling. Thus, during the three day period following the sale, that consumer may discuss the matter with relatives and friends or simply reflect upon whether he or she did the right thing. Having reached a decision, the consumer is able, if desired, to reverse the process. Satisfaction, or dissatisfaction, for that matter, with the contract terms or any work that may have been performed during that period is not, at that point, a relevant consideration. Therefore, even when the seller has done everything perfectly, the consumer may still cancel; if the right to cancel exists at all, dissatisfaction either with the deal or the performance cannot be the determining factor, or even one of them, in the assessment of whether, or not, to exercise the right or in determining if cancellation comes too late.

I agree that there are two approaches to take when a buyer fails to comply with § 14–302. I also agree with the majority's rejection of the first—strictly construing § 14–303 as providing for a three day cooling off period, and no more. As the majority points out, that approach does not give any effect to the legislative intent that the buyer be told of the right of cancellation. Op. at 339–41.

The majority opts for an alternative, allowing the right to run for a reasonable time, presumably from the date of the transaction. What constitutes a reasonable time is, we are told, determined by the totality of the circumstances, including the purpose of the cancellation right and the fact that there was no disclosure of that right by the seller. Op. at 341–42. The majority does not specify, as among the factors to be considered, whether, and as of when, the buyer knew, or should have known, that he or she had a right to cancel the contract.

I believe that the most important factor to be considered in the determination whether the right to cancel was exer-

cised within a reasonable time is the point when the buyer is made aware, or should have known, that the right exists. In my view, therefore, a reasonable time is either three days after the seller complies with the statutory requirement or three days after the consumer acquired, or should have acquired, knowledge of the right.

In this case, the majority is impressed by the trial court's findings of fact. On the basis of those findings, and the circumstances already mentioned, it determined, as a matter of law, that the appellant did not exercise her right to cancel within a reasonable time. Critical to the trial court's findings of fact seems to be the fact that the appellant had not expressed dissatisfaction with the seller's performance. The excerpt from the trial court's oral opinion is illustrative:

[E]ven as late as the argument a few minutes ago I'm still trying to figure out what it is [Ms. Crystal] wants to satisfy her. And I don't know. And if I don't know then I can hardly say to Mr. Callahan, "You obviously didn't do what you were supposed to do." It may be obvious to her, but it is not to me then I can hardly say to Mr. Callahan, "You should have known what she wanted."

Still later, the trial court discussed the appellant's conduct in connection with the work being done by the seller as being the opposite of "dissatisfaction".

I cannot agree that the failure of the appellant to complain about, or indicate dissatisfaction with, the work being done is an adequate predicate for the court's determination that her cancellation of the contract came too late. In my opinion, as I have said, the critical factor to be considered is the extent to which the buyer knows, or should know, that he or she has the right to cancel the contract. That the buyer is also dissatisfied with the work that has been done is beside the point; certainly, the right to cancel ought not be conditioned on the buyer being dissatisfied with the seller's work.

The evidence in this record does not reveal when the appellant learned that she had a right to cancel the contract;

all the record reflects is that, at some point, she learned of the Door to Door Sales Act and that she formally cancelled her contract approximately one year after being sued on the contract. Had the trial judge found that the appellant knew of the right to cancel before she was sued or at some time more than three days before she gave notice of cancellation and there was evidence in the record to support that finding, then I would have no quarrel with the bottom line result in this case. Since, however, that issue was not addressed, not to mention determined, and, so, on this record, cannot be resolved without appellate fact finding, I would reverse and remand to the circuit court for further proceedings. A remand is appropriate also because we have today, for the first time, announced the test to be applied when measuring what constitutes a "reasonable time." I agree with the factors the majority identifies. There are also other factors to be considered. When all relevant factors are considered, I do not believe that the determination in this case should have been made as a matter of law. Whether, in this case, the appellant acted timely to cancel the contract should be decided by the trial court in light of the applicable factors. The trial court, of course, never did that; it had no opportunity to apply this new test. It should be allowed to do so.

In addition to the factors mentioned by the majority, the court should consider, as I have mentioned, any evidence tending to show that the buyer knew of the cancellation right and when that knowledge was acquired. Should there be no such evidence, the court must consider whether there is any evidence tending to establish that the buyer should have known of the right. In that regard, factors bearing on the issue include the amount of time that has elapsed between the transaction and the buyer's notice of cancellation; whether and, if so, as of when, the buyer obtained legal representation; whether and, if so, how much, work has been done pursuant to the contract; and whether there is evidence that the seller attempted to suppress informa-

tion concerning the right shed light on the buyer's knowledge of the right to cancel should also be considered.[2]

Fairness, as the majority points out, is also a factor to be considered in determining whether the buyer cancelled the contract within a reasonable time. Fairness may not be viewed in isolation, however. It must be considered as just one factor in the totality of the circumstances. A seller who willfully suppresses information concerning the buyer's right to cancel, thus, assuring the buyer's ignorance on the point, should not benefit from that action, even if means that the seller may lose a great deal as a result of a late cancellation. Moreover, where the law imposes duties and responsibilities on a party, an omission by the party on whom such duties and responsibilities are imposed must be considered strongly against that party. On the other side of the ledger, of course, is, as indicated above, how much the buyer knows, or should know. It is not enough to say that, because the buyer will benefit from a particular transaction and, concomitantly, the seller will lose, the result is unfair. To take that posture would be to disregard in large measure the legislative intent in seeking to protect consumers. *Accord Citaramanis v. Hallowell*, 328 Md. 142, 165, 613 A.2d 964, 975 (1992) (Bell, J. dissenting).

ELDRIDGE and CHASANOW, JJ., join in these views.

---

**2.** Robert Manso, who was the appellee's foreman when the subject contract was performed, testified, at trial, as to what he told the appellant:

I told her if she wasn't happy with the job that was done that her only recourse was to either talk to the Home Improvement Commission or hire herself a lawyer to get something fixed or adjusted or speak with Mr. Callahan to try and straighten it out which she said she did and could not do. Between them, I told her those were her only other recourses.