### HEAT EXCHANGERS, INC. *v.* MAP CONSTRUCTION CORPORATION

[No. 519, September Term, 1976.]

*Decided February 7, 1977.*

The cause was argued before POWERS, MENCHINE and MOORE, JJ.

*Arthur C. Elgin, Jr.*, with whom were *Jackson, Campbell & Parkinson* on the brief, for appellant.

*Joel I. Hoffman*, with whom were *Kamerow & Kamerow, P.C.* on the brief, for appellee.

MENCHINE, J., delivered the opinion of the Court.

Map Construction Corporation (Map) brought suit against Heat Exchangers, Inc. (Heat) and another [1] in the Circuit Court for Montgomery County for alleged breach of contract. Heat filed a counterclaim against Map alleging breach of contract.[2]

The original action and the counterclaim were tried together in a bench trial with judgment nisi and absolute entered in favor of Map against Heat for $31,640.48 in the original suit and judgment nisi and absolute entered in favor of Map for costs against Heat in the counterclaim.

The appeal by Heat raises in this Court the single following issue:

> "Did the lower court err by failing to determine whether the failure of Heat Exchangers, Inc. to timely deliver was excused by 'commercial impracticality'?"

Heat's contention on appeal rests upon the provisions of the Annotated Code of Maryland CL § 2-615 that reads as follows:

> "§ 2-615. *Excuse by failure of presupposed conditions.*
>
> Except so far as a seller may have assumed a greater

---

[1]. Airpac Systems, Inc., a manufacturer's representative of Heat. Airpac's motion for summary judgment as to it had been granted by the court below. No appeal was taken from that judgment.

[2]. In argument in this Court, counsel for Heat conceded that there was legally sufficient evidence to show that Map was justified in contracting with another contractor (The Whalen Company) and agreed that Heat "could not come back and sue Map" for the alleged breach of the contract by the latter. This concession disposes of the appeal in Heat's counterclaim and compels affirmance of the judgment entered therein.

obligation and subject to the preceding section on substituted performance:

(a) Delay in delivery or nondelivery in whole or in part by a seller who complies with paragraphs (b) and (c) is not a breach of his duty under a contract for sale if performance as agreed has been made impracticable by the occurrence of a contingency the nonoccurrence of which was a basic assumption on which the contract was made or by compliance in good faith with any applicable foreign or domestic governmental regulation or order whether or not it later proves to be invalid.

(b) Where the causes mentioned in paragraph (a) affect only a part of the seller's capacity to perform, he must allocate production and deliveries among his customers but may at his option include regular customers not then under contract as well as his own requirements for further manufacture. He may so allocate in any manner which is fair and reasonable.

(c) The seller must notify the buyer seasonably that there will be delay or nondelivery and, when allocation is required under paragraph (b), of the estimated quota thus made available for the buyer."

Map argues alternatively:

1. That the issue suggested on this appeal was not raised or decided below and is not before us under Rule 1085; and

2. That the evidence failed to establish excuse by failure of presupposed conditions under § 2-615.

### Maryland Rule 1085

The record contains testimony indicating that appellant relied in part on the provisions of § 2-615, *supra.* Although the trial judge made no specific reference to that section in his oral opinion, he did make reference generally to the Uniform Commercial Code and we think his decision implies that he found that § 2-615 furnished no justification for Heat's failure to perform. Under these circumstances, Maryland Rule 1085 is not applicable. *Panamerican Co. v. Broun,* 238 Md. 438, 447, 209 A. 2d 575, 579-80 (1965); *Kent v.*

*Mer. Safe Dep. & Tr. Co.*, 225 Md. 590, 593, 171 A. 2d 723, 725 (1961).

### The Impact of § 2-615

This section of the Uniform Commercial Code has not been the subject of appellate interpretation in Maryland. The Official Comment upon the section begins as follows:

*"Prior uniform statutory provision: None.*

*Purposes:*

1. This section excuses a seller from timely delivery of goods contracted for, where his performance has become commercially impracticable because of unforeseen supervening circumstances not within the contemplation of the parties at the time of contracting."

Certain facts are not in dispute and fairly may be summarized as follows:

In November, 1973, contract discussions took place between Airpac Systems, Inc. (Airpac), manufacturer's representative for Heat, and Map. On April 4, 1974, after bids had been received by Map from Heat and another company, Map signed a purchase order for 398 custom designed air conditioning units and essential plumbing connections (hereinafter described as risers), to be assembled and installed by Heat in a multi-story apartment building to be constructed by Map. The bid price of Heat was $199,500.00. In the latter part of April, 1974, Heat submitted drawings and specifications for the units and risers.

On May 7, 1974, The Whalen Company (Whalen), that had been the unsuccessful second bidder, advised Map that the proposed drawings and specifications furnished by Heat indicated a possible infringement of a patent owned by Whalen. Heat thereafter gave Map a letter of indemnification against a suit for patent infringement. Nonetheless, Heat with the concurrence of Map, decided to change the original design of the units so that the risers connecting the units from floor to floor would be placed outside of rather than within the unit cabinets.

On June 4, 1974, Heat undertook to assemble and install the units as redesigned. Map received and accepted Heat's undertaking on June 10, 1974. The acceptance document, prepared by Heat, bore the notation "Thank you for your order we will ship on or about Aug. 25, 1974." On July 1, 1974, Map requested that risers and equipment for the first five floors be released for shipment as soon as possible with "the balance of the equipment for the anticipated delivery date of 25 August 1974." No shipments were made.

On August 22, 1974, Airpac wrote Map advising that Heat was requesting a price increase of $10,154.00. On June 18, 1974, Heat had informed Airpac (its representative) that such a price increase would be necessary. This suggested increase was not disclosed to Map, however, until August, apparently because of fear that the contract might be cancelled by Map.

On August 30, 1974, Map by telephone agreed to the price increase but requested early delivery of the shipment. On September 3, 1974, Map formally approved and returned to Heat a document showing agreement by the parties to the price change. Heat had endorsed on that document a notation declaring that "riser section assemblies will precede equipment shipments and should leave the factory within the next week to ten days." No shipments were made by Heat.

On September 6, 1974, Map sent a letter to Heat stating, *inter alia*, that "It is imperative that we get the first five floors of equipment by the end of this month." Heat did not demur.

On September 10, 1974, Map, by telephone, repeated to Heat that delivery must occur before the end of September. On September 27th, Heat informed Map that the risers would be shipped "next week for sure." No shipment was made.

Testimony offered by Map indicated that the failure of Heat to supply the equipment prevented orderly progress of various trades in the course of construction of the apartment building, causing Map to be faced with back charges.

On October 3, 1974, in the course of a telephone

communication with a representative of Heat, Map was advised that the risers had not yet been shipped; that Heat would try to ship them the third week of October, but could not promise. Map thereupon "decided to seek another source." Map contracted with Whalen on October 7, 1974, at higher cost.

The requisites of proof before nondelivery may be excused under the provisions of § 2-615 were thus succinctly stated in *Neal-Cooper Grain Co. v. Texas Gulf Sulphur Co.*, 508 F. 2d 283 (7th Cir. 1974):

> " '(1) a contingency must occur (2) performance must thereby be made "impracticable" and (3) the non-occurrence of the contingency must have been a basic assumption on which the contract was made.' " 508 F. 2d at 293.

We adopt that interpretation of § 2-615.

Appellant alleges that an intervening contingency prevented delivery of the goods by reason of:

(a) strikes;

(b) necessary price increases resulting from the supply shortage of component parts;

(c) the threat of a patent infringement suit; and

(d) inability to get necessary components from suppliers.

The proof does not support the allegations.

(a) *Strikes*

Lloyd L. Ludkey, marketing and sales manager of Heat and the sole witness offered by it, testified as follows:

> "There has been some testimony having to do with strikes of various factories. In my estimation the strikes caused a very small portion of the problems that we encountered at that time."

We find nothing in the record showing or tending to show that strikes in any way provided an excuse for nondelivery.

(b) *Price Increases*

The only evidence relating to the necessity for a price increase was that the initial contract price must be increased

by $10,154.00. Map had agreed to the price increase. Moreover, the record shows that Heat was aware of the necessity for such an increase on June 18, 1974, but Map was not so informed until August 22, 1974. Here, too, we find nothing supporting a contention that price increases would justify nondelivery.

(c) *The Threat of a Patent Infringement Suit*

"Q There was ultimately no patent infringement suit or injunction filed, was there?

A There was not; not to my knowledge.

Q Who were the persons who reconciled that situation?

A At our factory, Engineering, Production and myself would have arrived at the decision to suggest to the customer that we in fact escape the possibility [of patent infringement] by not including the risers in the cabinets, and we would have secured permission, which we did, from Map Construction, either directly or through Air-Pac Systems.

Q Finally a reconciliation or settlement was accomplished?

A Yes. Again, I can't pin it down, but I would say it would have to be in June. On July 1 we received from Air-Pac Systems the release." (From testimony of Heat's representative.)

Again, the evidence is wholly lacking in proof that threat of patent infringement would bring the contract within § 2-615.

(d) *Inability of Heat to Obtain Component Parts from Suppliers*

It is this contention alone to which we will apply the tests suggested in *Neal-Cooper Grain Co. v. Texas Gulf Sulphur Co., supra.*

*The Contingency*

The generality of Heat's contention appears from the following excerpt from Ludkey's testimony:

"The last half or the last two-thirds of 1974 in business in general and particular to the air conditioning industry, which is the one in which I was working, were extremely difficult. Components which normally required eight to ten weeks delivery went as high as 40 and in some instances 50 weeks. The basic and overall problem was caused by the demand from the market which many, many times exceeded the capability of any manufacturer to meet. This caused numerous shortages for numerous manufacturers. In our case and in the case of most of our competitors and/or other manufacturers, delays which were nearly impossible to combat.

"I know of an instance of one of five purchasing agents from one of the largest general contractors in the United States who at that time came to my office, and his sole purpose in being there was we yet needed to deliver two large air conditioning units for a building in Georgia, which was holding up construction. He didn't come to our plant strictly — he came to our plant strictly to see me. That was not his first and only stop on the trip. He was out calling on a manufacturer late in delivering pumps for the project. He indicated he was one of five men in his department, and that day all five men were out doing similar things.

"When suppliers gave delivery dates at that time I would have to say it was rare that the delivery dates were kept. Many — some manufacturers — did not even give a delivery date.

"Another indication of that business decline at that time was rapidly escalating prices. There was testimony earlier having to do with the fact that we

requested escalation of pricing on this project, which we did, and we also requested it on other projects. There were numerous manufacturers who didn't have to request escalation because when they accepted orders during the last half of '74, there was no price in the contract, other than the statement 'price will be in effect at the time of shipment.'

"It was a time that I — with business conditions that I have never experienced before, and I doubt that anyone else has."

The difficulty confronting acceptance of those generalities is that while they sound impressive in the abstract, they were shown but feebly, if at all, to apply to the subject contract.

We note the following specifics:

1. Heat knew by July 1, 1974, that Map had agreed to risers outside of, rather than within the cabinets, yet no order for cabinets was placed until August 10, 1974.

2. No order by Heat for the risers required by the changed design was placed until August 30, 1974.

3. Heat, by letter dated September 3, 1974, promised delivery of fabricated risers "within a week to ten days" although material for fabrication was not then in their hands.

4. Heat had orders for similar risers from other purchasers in Map's position at about the same time but offered no evidence as to whether or not those orders had been timely delivered to customers.

5. Heat had received orders for cabinets utilizing similar outside risers for projects in Las Vegas and in Michigan but offered no evidence as to whether or not those cabinets had been timely delivered to those customers.

Although it is doubtful indeed that the evidence is legally sufficient to establish the occurrence of a contingency within

the meaning of § 2-615, we shall assume, without deciding, that there was a contingency and shall give consideration to the other essentials of proof required to trigger operation of § 2-615. The burden of such proof, of course, rests upon the party claiming excuse. *Eastern Air Lines, Inc. v. Gulf Oil Corp.*, 415 F. Supp. 429, 438 (S.D. Fla. 1975).

### Commercial Impracticability

The only component parts of the promised air conditioning units to which Heat made specific reference was to the risers and to the cabinets. With respect to both, the evidence is uncontradicted that Heat delayed orders for both for about two months. No explanation for that delay in placing the order for those components was made by Heat. There is not a scintilla of evidence that other component parts of the units were in short supply, beyond the broad generalities voiced by Ludkey.

### Basic Assumption of Nonoccurrence

Circumstances existing at the contracting date and foreseeability play a part in determining whether a party should be relieved of his contract. *Maple Farms, Inc. v. City School District*, 352 N.Y.S.2d 784 (S. Ct. Spec. Term, Chemung County 1974). *Mishara Const. Co. Inc. v. Transit-Mixed Con. Corp.*, 310 N.E.2d 363 (Mass. 1974).

In *Maple Farms, supra,* applicability of § 2-615 was rejected despite proof of the certainty of severe loss to the seller. It had been shown that cost increases of 23% had occurred in the six month period immediately following the contract date — but the proof also disclosed that the contracting seller was aware of a 9.5% price increase in the year preceding that date. In those circumstances, the Court said at 789-90:

> "Applying these rules to the facts here we find that the contingency causing the increase of the price of raw milk was not totally unexpected. The price from the low point in the year 1972 to the price on the date of the award of the contract in June 1973 had risen nearly 10% and any

businessman should have been aware of the general inflation in this country during the previous years and of the chance of crop failures. . . . [The contracting seller] had knowledge that for many years the Department of Agriculture had established the price of raw milk and that that price varied. It nevertheless entered into this agreement with that knowledge. It did not provide in the contract any exculpatory clause to excuse it from performance in the event of a substantial rise in the price of raw milk. On these facts the risk of a substantial or abnormal increase in the price of raw milk can be allocated to the plaintiff."

In *Mishara, supra,* Justice Reardon, for the Court, said at 367:

"The emphasis in contracts governed by the Uniform Commercial Code is on the commercial context in which the agreement was made. The question is, given the commercial circumstances in which the parties dealt: Was the contingency which developed one which the parties could reasonably be thought to have foreseen as a real possibility which could affect performance? Was it one of that variety of risks which the parties were tacitly assigning to the promisor by their failure to provide for it explicitly? If it were, performance will be required. If it could not be so considered, performance is excused. The contract cannot be reasonably thought to govern in these circumstances, and the parties are both thrown upon the resources of the open market without the benefit of their contract."

Analogously, Heat acknowledged supply difficulties during the first half of 1974. Nonetheless, Heat not only failed to provide an exculpatory clause in the contract, but persistently and consistently assured Map that the latter's requested delivery date would be met in timely fashion.

In sum, from the inception of the initial agreement of the parties and continuing through Map's decision to obtain its air conditioning units from another supplier, Heat consistently had assured Map of an ability to deliver within the latter's desired time limitations. In every instance the assurance proved chimerical.

Heat at no time advised Map that its nonperformance was occasioned by "failure of presupposed conditions."

The following pertinent part of paragraph 8 of the Official Comment also bears importantly on this element of § 2-615:

> "The provisions of this section are made subject to assumption of greater liability by agreement and such agreement is to be found not only in the expressed terms of the contract but in the circumstances surrounding the contracting, in trade usage and the like. Thus the exemptions of this section do not apply when the contingency in question is sufficiently foreshadowed at the time of contracting to be included among the business risks which are fairly to be regarded as part of the dickered terms, either consciously or as a matter of reasonable, commercial interpretation from the circumstances."

We have no doubt that the evidence in the subject case tends to show that the supposed contingency could have been foreseen by the seller as a real possibility and would permit a conclusion to be reached that the risk of its occurrence tacitly was assigned to Heat by reason of the failure explicitly to provide against it in the contract.

We have reviewed this case upon both the law and the evidence in accordance with the mandate of Maryland Rule 1086. We shall affirm.

*Judgments affirmed.*
*Costs to be paid by appellant.*