ALAMANCE COUNTY BOARD OF EDUCATION, ALBEMARLE CITY BOARD OF EDU-
CATION, BRUNSWICK COUNTY BOARD OF EDUCATION, CABARRUS COUNTY
BOARD OF EDUCATION, CALDWELL COUNTY BOARD OF EDUCATION, DARE
COUNTY BOARD OF EDUCATION, DAVIDSON COUNTY BOARD OF EDUCA-
TION, ELIZABETH CITY-PASQUOTANK BOARD OF EDUCATION, HALIFAX
COUNTY BOARD OF EDUCATION, HENDERSON COUNTY BOARD OF EDUCA-
TION, HICKORY CITY BOARD OF EDUCATION, LEXINGTON CITY BOARD OF
EDUCATION, MACON COUNTY BOARD OF EDUCATION, MADISON COUNTY
BOARD OF EDUCATION, MARTIN COUNTY BOARD OF EDUCATION, NEW
HANOVER COUNTY BOARD OF EDUCATION, ORANGE COUNTY BOARD OF ·
EDUCATION, PAMLICO COUNTY BOARD OF EDUCATION, RANDOLPH
COUNTY BOARD OF EDUCATION, REIDSVILLE CITY BOARD OF EDUCATION,
RICHMOND COUNTY BOARD OF EDUCATION, SCOTLAND COUNTY BOARD
OF EDUCATION, SURRY COUNTY BOARD OF EDUCATION, SWAIN COUNTY
BOARD OF EDUCATION, TRANSYLVANIA COUNTY BOARD OF EDUCATION,
TYRRELL COUNTY BOARD OF EDUCATION, WAKE COUNTY BOARD OF EDU-
CATION, WINSTON-SALEM/FORSYTH COUNTY BOARD OF EDUCATION,
PLAINTIFFS v. BOBBY MURRAY CHEVROLET, INC., DEFENDANT AND THIRD-PARTY
PLAINTIFF v. GENERAL MOTORS CORPORATION, THIRD-PARTY DEFENDANT

No. 9422SC668

(Filed 2 January 1996)

## Sales § 50 (NCI4th)— supply of school buses—discontinued by factory—commercial impracticality—summary judgment for plaintiffs

Summary judgment was properly granted for plaintiffs in an action for excess costs resulting from the purchase of school buses from another source where defendant, a General Motors franchisee, placed a bid which was accepted to provide approximately 1200 school bus chassis; the chassis were described as "Chevrolet" in the bid but were to be manufactured by GM Truck; the EPA enacted changes in emissions standards for heavy duty diesel engines, rendering the engine described in the bid out of compliance; GM had tendered an extension of time for ordering chassis, which was accepted; GM shortly thereafter requested that the cut-off date for orders be moved forward, which was accepted; GM subsequently notified defendant that the chassis order placed during the reduced extended period would not be filled due to the unavailability of transmissions; and defendant notified the Division of Purchase and Contract of the N.C. Department of Administration, which assumes responsibility for contracting with various vendors on behalf of the boards of education, that the chassis could not be supplied. Although defendant contends that its lack of performance should be excused pur-

suant to N.C.G.S. § 25-2-615, there is no record evidence that plaintiffs had knowledge that defendant's sole source of supply was General Motors; defendant assumed the risk of its failure to supply the vehicles; governmental regulations do not excuse per- formance under a contract where a party has assumed the risk of such regulation, which defendant did; defendant did not act as an agent of GM in accepting orders during the extended period; and there was no apparent agency in that no evidence establishes that GM represented defendant to be its agent or permitted defendant to represent itself as GM's agent.

**Am Jur 2d, Contracts §§ 676, 684.**

**Modern status of the rules regarding impossibility of performance as defense in action for breach of contract. 84 ALR2d 12.**

**Impracticability of performance of sales contract as defense under UCC § 2-615. 93 ALR3d 584.**

Appeal by defendant from judgment entered 18 April 1994 by Judge F. Fetzer Mills in Davidson County Superior Court. Heard in the Court of Appeals 23 February 1995.

*Brinkley, Walser, McGirt, Miller, Smith & Coles, by Walter F. Brinkley and S. Ranchor Harris, for plaintiffs-appellees.*

*Gulley, Kuhn & Taylor, L.L.P., by Jack P. Gulley and David J. Kuhn, for defendant-appellant.*

JOHN, Judge.

Defendant Bobby Murray Chevrolet, Inc. (Bobby Murray) appeals the trial court's entry of summary judgment in favor of plaintiffs, a number of North Carolina school boards (plaintiffs; school boards), on their respective claims for breach of contract. Defendant contends application of N.C.G.S. § 25-2-615 (1995) regarding commercial impracticability operates under the facts of the case *sub judice* to excuse its performance under the contracts with plaintiffs. We disagree.

Pertinent factual and procedural information is as follows: Bobby Murray, a General Motors franchisee, received an invitation on or about 7 April 1989 to bid on approximately 1200 school bus chassis from the North Carolina Department of Administration's Division of

Purchase and Contract (the Division). The Division assumes responsibility for contracting with various vendors of supplies and equipment on behalf of state entities, including boards of education. As is customary, the Division on this occasion sent bid invitations containing the required chassis specifications to a number of motor vehicle dealers.

After consulting with the GMC Truck Division (GM Truck) of defendant General Motors Corporation (GM) regarding prices and availability, Bobby Murray proposed to supply several different sizes of chassis at specified prices. The chassis were described as "Chevrolet" brand in the bid, but were to be manufactured by GM Truck.

Bobby Murray's bid was accepted by the Division, and the initial deadline for orders pursuant to the contract was set at 31 July 1990. All orders submitted prior to this date were properly filled by Bobby Murray and are not the subject of the instant litigation.

On 26 July 1990, the Environmental Protection Agency (EPA) enacted Federal Emissions Standards changes for heavy duty diesel engines, thereby rendering the 8.2N diesel engine described in Bobby Murray's bid out of compliance with the regulations effective 1 January 1991.

In mid-July 1990, GM tendered an extension of time for ordering chassis from 31 July to 31 August 1990. Bobby Murray conveyed this option to the Division, which accepted the extension. Shortly thereafter, GM requested the cut-off date for orders be moved forward to 14 August. The Division agreed and plaintiffs' orders were transmitted to Bobby Murray between 1 August 1990 and 14 August 1990. There is no contention these orders were not timely received by Bobby Murray or GM.

On 10 August 1990, Bobby Murray received a message from GM through its Dealer Communication System (DCS), a computer network linking GM with its dealers, setting the final chassis buildout date at the week of 10 December 1990, but warning that estimated production dates could be pushed back due to a potential shortage of the requisite brand of automatic transmission (Allison automatic transmissions). On 24 August 1990, in a DCS message to Bobby Murray, GM reiterated that due to "the uncertainty of major component availability," no further orders for school bus chassis would be accepted.

On 30 November 1990, another DCS message to Bobby Murray indicated that the chassis orders placed between 1 August and 14 August 1990 would not be filled due to unavailability of Allison automatic transmissions. Bobby Murray contacted GM Truck on or about 11 December 1990 and learned that none of the chassis were to be built prior to the end of December because the Allison transmissions would not be provided until February or March 1991. At that point, however, installation of the 8.2N diesel engines would be illegal in consequence of the modified EPA regulations. On or about 11 December 1990, Bobby Murray notified the Division the chassis could not be supplied.

On or about 23 January 1991, the Division informed Bobby Murray the chassis were being purchased from another source, and that it intended to hold Bobby Murray liable for any excess in cost. The substitute chassis were later obtained by plaintiffs, who subsequently filed suit against Bobby Murray for a total of $150,152.94, representing the difference between the bid prices and the actual amounts expended by plaintiffs in purchasing similar chassis. In its answer and third-party complaint against GM, Bobby Murray claimed, *inter alia*, that GM breached its contract with Bobby Murray to provide the chassis at issue and that Bobby Murray had merely been acting as an agent of GM. Thereafter, both the plaintiffs and GM filed motions for summary judgment.

Summary judgment was entered against Bobby Murray and in favor of plaintiffs 18 April 1994 by Judge F. Fetzer Mills in the amount of $150,152.94 plus interest at 8% per annum from 11 December 1990 until paid. A 19 April 1994 order entered by Judge Mills denied GM's motion for summary judgment. The latter order is not a subject of the present appeal and we express no opinion herein as to the merits of Bobby Murray's claim against GM. Bobby Murray's notice of appeal to this Court was timely filed 21 April 1994.

Summary judgment should be granted only where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that any party is entitled to a judgment as a matter of law." N.C.G.S. § 1A-1 Rule 56(c) (1990). The burden of establishing the lack of a triable issue rests with the moving party, and the facts will be viewed in a light most favorable to the nonmoving party. *Pembee Mfg. Corp. v. Cape Fear Constr. Co.*, 313 N.C. 488, 329 S.E.2d 350 (1985).

Bobby Murray admits the bus chassis ordered by plaintiff school boards were never delivered. However, Bobby Murray contends its lack of performance should be excused pursuant to N.C.G.S. § 25-2-615 (1995) which reads:

(a) Delay in delivery or nondelivery in whole or in part by a seller who complies with paragraphs (b) and (c) is not a breach of his duty under a contract for sale *if performance as agreed has been made impracticable by the occurrence of a contingency the nonoccurrence of which was a basic assumption on which the contract was made or by compliance in good faith with any applicable foreign or domestic governmental regulation* or order whether or not it later proves to be invalid.

(b) Where the causes mentioned in paragraph (a) affect only a part of the seller's capacity to perform, he must allocate production and deliveries among his customers but may at his option include regular customers not then under contract as well as his own requirements for further manufacture. He may so allocate in any manner which is fair and reasonable.

(c) The seller must notify the buyer seasonably that there will be delay or nondelivery and, when allocation is required under paragraph (b), of the estimated quota thus made available for the buyer.

(emphasis added).

Bobby Murray asserts two arguments based upon the foregoing statute. It contends the failure of GM to supply the bus chassis was "a contingency the nonoccurrence of which" was a basic assumption of the underlying contracts between Bobby Murray and plaintiffs. Second, Bobby Murray claims governmental regulation prohibiting the installation of the 8.2N engine after 1 January 1991 was an intervening factor which should operate as an excuse.

In 1965, North Carolina adopted the Uniform Commercial Code (U.C.C.) as Chapter 25 of the General Statutes, thereby creating N.C.G.S. § 25-2-615 as identical to U.C.C. § 2-615. A significant purpose behind enactment of the U.C.C. was to make uniform the laws among various jurisdictions with regards to commercial transactions. N.C.G.S. § 25-1-102(2)(c) (1995). To this point, no appellate decisions in North Carolina have interpreted or applied N.C.G.S. § 25-2-615. However, case law from outside jurisdictions interpreting the U.C.C., while not conclusive, affords guidance to this Court. *Evans v.*

*Everett,* 10 N.C.App. 435, 179 S.E.2d 120, *rev'd on other grounds,* 279 N.C. 352, 183 S.E.2d 109 (1971).

U.C.C. § 2-615 has its roots in the relatively recent common law doctrines of impossibility of performance and frustration of purpose, which evolved from the original common law rule that parties to a contract were to be held absolutely to its terms. Thomas R. Hurst, *Freedom of Contract in an Unstable Economy: Judicial Reallocation of Contractual Risks Under U.C.C. Section 2-615,* 54 N.C. L. Rev. 545, 549 (1976). The official comments to § 2-615 indicate that both doctrines were intended to be embraced within a U.C.C. concept denominated "commercial impracticability." *Id.* at 554.

Commentators have asserted that the drafters of the U.C.C. intended "commercial impracticability" to allow a more liberal standard in releasing promisors from contracts than the common law had afforded, but have also noted that courts generally have declined to heed such alleged intent. Paula Walter, *Commercial Impracticability in Contracts,* 61 St. John's L. Rev. 225, 227 (Winter 1987).

In order to be excused under § 2-615, a seller of goods must establish the following elements:

(1) performance has become "impracticable";

(2) the impracticability was due to the occurrence of some contingency which the parties expressly or impliedly agreed would discharge the promisor's duty to perform;

(3) the promisor did not assume the risk that the contingency would occur;

(4) the promisor seasonably notified the promisee of the delay in delivery or that delivery would not occur at all[.]

Hurst, *supra,* at 553-554.

Utilizing the foregoing criteria as well as the official commentary to § 2-615 and case law from other jurisdictions, we now consider Bobby Murray's arguments on appeal.

Initially, Bobby Murray contends an implied condition of its contract with plaintiffs was the ability of GM to manufacture and supply the ordered bus chassis. We agree that when an exclusive source of supply is specified in a contract or may be implied by circumstances to have been contemplated by the parties, failure of that source may excuse the promisor from performance. N.C.G.S. § 25-2-615, Official

Comment 5. However, neither contingency is reflected in the record herein.

Bobby Murray insists in its brief that "[a]ppellant disclosed in the bid that the chassis would be manufactured by Chevrolet and Plaintiff-Appellees had knowledge that Appellant's sole source of supply was General Motors." However, Bobby Murray points to no record evidence of such knowledge on the part of plaintiffs, and appears to rely solely upon its status as a GM franchisee to support its assertion.

By contrast, we note that the "General Contract Terms and Conditions" on Form TC-1, incorporated into the bid document, contain the following section entitled "MANUFACTURER'S NAMES":

Any manufacturers' names, trade names, brand names, information and/or catalog numbers used herein are for purpose(s) of description and establishing general quality levels. Such references are not intended to be restrictive and products of any manufacturer may be offered.

Further, no clause in the contract between plaintiffs and Bobby Murray conditioned the latter's performance on its ability to obtain bus chassis from its manufacturer. *See* William H. Henning & George I. Wallach, *The Law of Sales Under the Uniform Commercial Code*, ¶ 5.10[2], S5-4 (1994 Supplement) (generally, where seller fails to make contract with buyer contingent on adequate supply, courts reluctant to excuse seller). Plaintiffs aptly point to Richard M. Smith and Donald F. Clifford, Jr., *North Carolina Practice, Uniform Commercial Code Forms Annotated*, Vol. 1, § 2-615, Form 3 (1968), which indicates a seller of goods may limit its liability by inclusion of the following "Single Source Clause":

It is expressly understood that the seller has available only one source, [*name of single source*], of [*address*], for the [*name or identify the raw materials obtained by the seller from the single source*] used by the seller in the manufacture of the goods for the buyer under this contract. In the event of any interference or cessation of the supply from the seller's source of supply, the seller shall be temporarily, proportionately, or permanently relieved of liability under this contract, depending upon whether the interruption of the source of supply is a temporary interruption, a reduced delivery of materials, or a permanent cessation of supply.

Moreover, assuming *arguendo* GM *was* contemplated by the parties as Bobby Murray's exclusive source, the record reflects that Bobby Murray assumed the risk of its failure to supply the vehicles, as it was foreseeable that GM might not supply the bus chassis. Failure to make express provision for a foreseeable contingency in a sales contract implicitly places the burden of loss on the seller when the contingency comes to fruition. *Barbarossa & Sons, Inc. v. Iten Chevrolet, Inc.*, 265 N.W.2d 655, 659 (Minn. 1978) (contingency that seller would be unable to procure truck from General Motors "was clearly . . . foreseen . . . before entering the contract," and thus seller not excused).

Foreseeability under § 2-615 is an objective standard; it matters not whether the seller thought a certain event would or would not occur, but what contingencies were reasonably foreseeable at the time the contract was made. Henning & Wallach, *supra*, at ¶ 5.10[2], 5-36 (1992). Examination of the record reveals that cancellation of chassis orders by GM was a risk reasonably foreseeable to Bobby Murray.

For example, the "Dealer Sales and Service Agreement" between Bobby Murray and GM provides as follows:

Dealer's order for . . . Motor Vehicles are not binding on . . . [GM] until accepted by [GM] . . . . Orders are accepted by [GM] when Released to Production.

Vehicle orders thus bind GM only upon "Release to Production" of the subject vehicles. The bus chassis at issue herein were never "released to production."

The same document also suggests numerous factors which might affect the availability of vehicles, including "component availability" and "governmental regulations," and indicates that GM reserved the discretion to distribute vehicles based upon its own judgment.

Official Comment 5 of N.C.G.S. § 25-2-615, regarding failure of sources of supply, warns: "There is no excuse under this section, however, unless the seller has employed all due measures to assure himself that his source will not fail." The comment cites *Canadian Industrial Alcohol Co. v. Dunbar Molasses Co.*, 179 N.E. 383 (1932), in which a middleman contracted to supply a buyer with molasses. When the middleman's source was unable to deliver the required amount of molasses, the former claimed the excuse of impossibility. The court declined "to accept this defense because the middleman

had not even bothered to obtain a contract from the refinery to cover his obligations." Henning & Wallach, *supra*, at ¶ 5.10[1], 5-35 (1992); cf. *Lane v. Coe*, 262 N.C. 8, 136 S.E.2d 269 (1964) (when defendant's ability to perform depends upon cooperation of third party, defendant cannot rely on third party's later refusal to cooperate to claim impossibility).

Similarly, the record herein contains no evidence of a contract between Bobby Murray and GM to ensure delivery of the ordered chassis. Robin J. Fleming, fleet sales manager of Bobby Murray, in deposition simply claimed GM had never before failed to produce vehicles for which it had taken orders while he had been with Bobby Murray, notwithstanding provisions in the "Dealer Sales and Service Agreement" to the effect that orders did not bind GM until the vehicles were "Released to Production" and that certain specified factors might affect production.

Moreover, during the time orders were accepted from plaintiffs, Bobby Murray also received a DCS message revealing that GM was experiencing shortages of Allison automatic transmissions. Bobby Murray therefore also had actual notice its source of supply might fail.

We next examine Bobby Murray's contention its performance should be excused in consequence of intervening governmental regulations. Generally, governmental regulations do not excuse performance under a contract where a party has assumed the risk of such regulation. Henning & Wallach, *supra*, at ¶ 5.10, 5-33 (1992). The contract between the parties *sub judice*, in its "General Contract Terms and Conditions", Form TC-1, provided as follows:

> GOVERNMENTAL RESTRICTIONS: In the event any Governmental restrictions may be imposed which would necessitate alteration of the material, quality, workmanship or performance of the items offered on this proposal prior to their delivery, it shall be the responsibility of the successful bidder to notify this Division at once, indicating in his letter the specific regulation which required such alterations. The State reserves the right to accept any such alterations, including any price adjustments occasioned thereby, or to cancel the contract.

Bobby Murray, by terms of the parties' agreement, accepted responsibility for keeping abreast of governmental regulations bearing upon the contract.

In addition, Bobby Murray was on notice 26 July 1990 that new emissions standards would preclude, effective 1 January 1991, production of bus chassis using the 8.2N engine specified in its bid. Nothing in the record indicates that this information was conveyed to plaintiffs. Bobby Murray was further notified 10 August 1990 that production dates could be pushed beyond December 1990. The record contains no evidence that Bobby Murray explored with plaintiffs, or otherwise, alternative methods of meeting its contractual obligations. Under these circumstances, equity dictates that excuse by governmental regulation be unavailable to Bobby Murray. *See* N.C.G.S. § 25-1-103 (1995) ("Unless displaced by the particular provisions of this chapter, the principles of law and equity . . . shall supplement its provisions."). "The absence of fault is . . . an important part of a Section 2-615 defense." Henning & Wallach, *supra*, at ¶ 5.10[1], 5-34 (1992). In sum, governmental regulations do not supervene in this case.

Bobby Murray also argues that there is a material issue of fact whether seasonable notice was given plaintiffs that Bobby Murray would be unable to perform. However, in that we have determined Bobby Murray does not succeed under N.C.G.S. § 25-2-615(a), it is unnecessary to address N.C.G.S. § 25-2-615(c), dealing with the requirement that timely notice be given a buyer.

Lastly, Bobby Murray contends it should not be held liable for default because it was acting merely as an agent of GM when it accepted orders from plaintiffs. Bobby Murray appears to argue in its brief that while it is not normally an agent of GM, it became such an agent as a result of GM's extending the period for bus chassis orders from July 31 to August 31. It claims that orders between 31 July and 31 August were taken on behalf of GM by Bobby Murray as agent:

> The approval of the extension period created a relationship between General Motors and Appellant as Principal and agent, not as franchisor/franchisee and any franchise agreement between Appellant and General Motors is not applicable to deny a contractual relationship between General Motors and Plaintiff-Appellees.

The "Dealer Sales and Service Agreement" between Bobby Murray and GM specifies, "This Agreement does not make either party the agent or legal representative of the other for any purpose, nor does it grant either party authority to assume or create any obligation on behalf of or in the name of the others [sic]." In response,

Bobby Murray correctly insists that such labelling is not necessarily conclusive on the issue of whether Bobby Murray acted as an agent of GM on a particular occasion. *See* 3 Am. Jur. 2d *Agency* § 21 (1986) ("The manner in which the parties designate the relationship is not controlling, and if an act done by one person in behalf of another is in its essential nature one of agency, the one is the agent of such other notwithstanding he is not so called.").

Whether an agency relationship was created in this case is determined by "the nature and extent of control and supervision retained and exercised by [GM] over the methods or details of conducting the day-to-day operation [of Bobby Murray]." *See Hayman v. Ramada Inn, Inc.*, 86 N.C. App. 274, 277, 357 S.E.2d 394, 397, *disc. review denied*, 320 N.C. 631, 360 S.E.2d 87 (1987). We do not believe extension of the date by which Bobby Murray could place orders for school bus chassis in any way constituted an exercise of day-to-day control by GM over the operation of its franchisee. For example, Robin Fleming admitted Bobby Murray is an "independent dealership" and stated GM "is not involved at all with the amount of profit that Bobby Murray determines . . . that we want to make."

Bobby Murray further contends that even in the absence of actual agency, an apparent agency existed.

Where a person by words or conduct represents or permits it to be represented that another person is his agent, he will be estopped to deny the agency as against third persons who have dealt, on the faith of such representation, with the person so held out as agent, even if no agency existed in fact.

*Id.* at 278, 357 S.E.2d at 397 (quoting *Fike v. Bd. of Trustees*, 53 N.C. App. 78, 80, 279 S.E.2d 910, 912, *disc. review denied*, 304 N.C. 194, 285 S.E.2d 98 (1981)). No evidence establishes that GM represented Bobby Murray to be its agent or permitted Bobby Murray to represent itself as GM's agent. Thus, Bobby Murray's apparent agency argument also fails.

In sum, taking the evidence presented in the light most favorable to Bobby Murray, we hold there exists no genuine issue of material fact as to plaintiffs' respective claims of breach of contract against Bobby Murray, and Bobby Murray's arguments to the contrary are unavailing. The trial court thus properly granted plaintiffs' summary judgment motion.

Affirmed.

Judges JOHNSON and MARTIN, Mark D. concur.