**ROCKLAND INDUSTRIES, INC.**

v.

**E+E (US) INC., Manley–Regan Chemicals Division.**

Civil No. B–95–1978.

United States District Court,
D. Maryland.

Jan. 15, 1998.

Daniel R. Chemers, Barry Cohen, Weinberg & Green, L.L.C. of Baltimore, MD, for Plaintiff.

Stephen H. Kaufman, Levin & Gann, P.A. of Baltimore, MD, for Defendant.

WALTER E. BLACK, Jr., Senior District Judge.

Plaintiff, Rockland Industries, Inc. ("Rockland"), brings this action against E + E (US) Inc., Manley–Regan Chemicals Division ("Manley–Regan"), alleging breach of contract under the provisions of Maryland's Uniform Commercial Code, Md.Code Ann., Com. Law §§ 2–101 *et seq.* (1997). According to plaintiff, Manley–Regan orally agreed to sell Rockland three containers of antimony oxide at the agreed price of $1.80 per pound, and the oral contract was subsequently confirmed by a written purchase order. Manley–Regan was ultimately unable to supply the antimony oxide. Rockland then purchased an equivalent amount of the chemical elsewhere at an increased price and filed this suit to recover the difference between the cost of cover and the contract price. Manley–Regan moved for summary judgment on August 16, 1996. The Court found the facts materially in dispute and denied the defendant's motion on all grounds.

This case was tried to the Court from October 27, 1997 through October 30, 1997. This Opinion constitutes the Court's findings of fact and conclusions of law under Rule 52(a) of the Federal Rules of Civil Procedure.

## I.

The facts giving rise to the present action are as follows. Rockland is a Maryland corporation that manufactures drapery lining fabrics. Rockland uses approximately 500,000 pounds per year of antimony oxide, a fire retardant, on its fabrics. Manley–Regan is a Pennsylvania chemical distribution company. Prior to the events giving rise to this litigation, Manley–Regan and Rockland had a supply relationship for chemicals such as caustic soda and ammonium sulfate. There was no history, however, of Manley–Regan ever supplying Rockland with antimony oxide.

Prior to May 1994, Rockland purchased its antimony oxide from a chemical company known as HoltraChem on an "as-need" basis where HoltraChem quoted a price based on the understanding that Rockland required approximately 500,000 pounds per year of antimony oxide-particularly the twinkling star grade.[1] Rockland needed a guaranteed supply but stockpiling was not a favored option because it tied up cash. Therefore, having this secure arrangement with Holtra-Chem was an ideal situation. When supply and prices were stable in the antimony oxide market, this arrangement posed no problem to HoltraChem. However, due to a serious worldwide crisis in the supply of this chemical in the spring of 1994, HoltraChem could no longer maintain its existing supply relationship with Rockland. Rockland's understanding was that HoltraChem could no longer stockpile antimony oxide but might be able to supply it from time to time. Consequently, the three senior executives at Rockland, Chief Financial Officer Vance E. Honeycutt, President Alexander R. Leaderman, and General Counsel Mark R. Berman, decided to try to secure alternate sources of supply of antimony oxide as it was critical to Rockland's business. Conrad E. Ailstock, Rockland's Purchasing Agent during the spring of 1994, was instructed to inquire of other suppliers about providing antimony oxide. Berman and a Rockland chemist, Bin Yu, also looked into other sources of the chemical. Their inquiries produced information of the extremely tight nature of the market and the rising prices with no known recovery period. Ultimately, the Rockland executives decided to enter into firm contracts for antimony oxide at known prices as soon as possible and to stockpile a six to eight-month supply. This amount was thought to be sufficient to protect Rockland's business if the market were to get worse.

In late April or early May 1994, when Ailstock was making initial inquiries regarding alternate sources of antimony, he was contacted by David Hess, a new sales representative from Manley–Regan. Hess had called Ailstock to introduce himself because of the ongoing supply relationship between Manley–Regan and Rockland. Shortly

---

1. The price charged by HoltraChem in early 1994, during three sales to Rockland under the "as-need" relationship and one sale after the "as-need" relationship ended was $.86 per pound.

thereafter, Ailstock informed Hess of Rockland's needs for antimony oxide and asked him to look into possible resources. Hess had never dealt with this chemical before and told Ailstock he would get information on antimony oxide availability. After several more conversations in which Ailstock and Hess discussed the particulars of antimony oxide, Hess informed Ailstock that he had a contact; however, this contact was subject to a noncompete agreement, and, accordingly, Hess could not discuss availability of the chemical until June 1, 1994. Sometime in early June, Hess revealed to Ailstock that the contact for antimony oxide was Allen Traiger of GFI Chemicals, Inc. ("GFI") located in Miami, Florida. Subsequent conversations between Ailstock and Hess occurred where quantity and grade of antimony oxide were discussed. Ailstock testified that on June 27, 1994, Hess called him and told him he could obtain two to three containers of antimony oxide at $1.80 per pound. Ailstock told Hess that he would have to get management approval and would get back to him. Ailstock testified that on the same day upon getting Leaderman's approval, he called Hess back and left him a message on voicemail regarding the approval. Hess returned the message on the 27th or 28th at which time Ailstock told Hess he had approval to accept the three containers at $1.80 per pound for delivery in early August. Hess then asked for a purchase order number which Ailstock gave him reflecting a purchase of 114,000 pounds of antimony oxide at $1.80 per pound. At this point, Ailstock understood that he had a firm commitment from Manley–Regan. Hess, however, testified that he understood the commitment was contingent upon delivery from GFI.

The Rockland purchase orders of antimony oxide after the termination of the firm HoltraChem supply relationship in April 1994, show that Rockland entered into contracts with ICC, ICC c/o Dunleary, HoltraChem, and Manley–Regan during May and June 1994, for antimony oxide. These contracts were intended to fill Rockland's six to eight-month stockpile plan. Ailstock testified that all the contracts were firm commitments, and that he would not have entered into a condi-

tional contract because Rockland needed a guaranteed supply to meet their stockpile goal. By July 1994, Rockland's standing contracts, including the alleged contract with Manley–Regan, committed them to enough antimony oxide to get them through the first quarter of 1995, and, therefore, the decision was made to make no further purchases for the time being.

Throughout July, Ailstock and Hess were in frequent contact. Hess informed Ailstock of the progress of the antimony oxide coming from China after receiving updates from Traiger. At some point in late July, Hess informed Ailstock that there would be a slight delay but that the load was still on the way. Ailstock testified that he was assured repeatedly that the load was "on the water." However, on September 9, 1994, Hess telephoned Ailstock and informed him that the product was not coming. Hess told Ailstock that Manley–Regan was looking into legal claims against their supplier or against the Chinese government directly.

Ailstock immediately reported this news to Berman and Honeycutt. He worked with Berman to find a substitute supply. The first replacement purchase was made on September 19, 1994, for 44,092 pounds of antimony oxide at $2.65 per pound from ICC c/o Dunleary. Leaderman entered into this contract because Ailstock was on vacation. Ailstock made a further purchase of antimony oxide from Chi Mei on September 30, 1994, for 88,184 pounds at $2.54 per pound. Of this purchase, 69,908 pounds would go toward replacing the balance of the Manley–Regan order.

## II.

In a breach of contract action, the defendant can refute the existence of a contract while at the same time arguing that it did in fact perform according to the contract terms therein. In this case, the defendant relies entirely on an affirmative defense to the alleged breach which presupposes the existence of a contract between Rockland and Manley–Regan for the antimony oxide at is-

sue.[2] Accordingly, the Court will treat the existence of a contract as conceded by the defendant and need not address the issue of contract formation in this Opinion.

The defendant contends that it is excused from performance due to the failure of a known sole source of supply that was a basic assumption of both parties at the time of the contract's formation. This "sole source" defense falls under the umbrella defense of "commercial impracticability" which excuses a party from performance of a contract where certain unforeseen conditions not within that party's control make performance impracticable. Section 2–615 of the Maryland Uniform Commercial Code. (U.C.C.) is the key statutory provision addressing commercial impracticability for sales of goods. The U.C.C. applies to this contract concerning the sale of antimony oxide. Section 2–615 states in relevant part:

Except so far as a seller may have assumed a greater obligation and subject to the preceding section on substituted performance:

(a) Delay in delivery or nondelivery in whole or in part by a seller who complies with paragraphs (b) and (c) is not a breach of his duty under a contract for sale if performance as agreed has been made impracticable by the occurrence of a contingency the nonoccurrence of which was a basic assumption on which the contract was made....

Md.Code Ann., Com. Law § 2–615 (1997).

The defendant asserts that the facts of this case create the classic example of sole source failure, and thus Manley–Regan is excused from performance. The defendant relies on official comment 5 to § 2–615 which states in part:

Where a particular source of supply is exclusive under the agreement and fails through casualty, the present section applies.... In the case of failure of production by an agreed source for causes beyond the seller's control, the seller should, if

possible, be excused since production by an agreed source is without more a basic assumption of the contract.

*Id.* § 2–615 cmt. 5.

The Court agrees that a sole source failure falls within the meaning of § 2–615, however, the defendant's analysis of § 2–615 is incomplete. Plaintiff points out that official comment 8 to § 2–615 also applies to this case. Comment 8 states in relevant part:

The provision of this section are made subject to assumption of greater liability by agreement and such agreement is to be found not only in the expressed terms of the contract but in the circumstances surrounding the contracting, in trade usage and the like. Thus *the exemptions of this section do not apply when the contingency in question is sufficiently foreshadowed at the time of contracting to be included among the business risks which are fairly to be regarded as part of the dickered terms,* either consciously or as a matter of reasonable, commercial interpretation from the circumstances.

*Id.* § 2–615 cmt. 8 (emphasis added).

The Court finds the comprehensive test for failure of a sole source best summed up by White & Summers in their U.C.C. treatise, *Uniform Commercial Code:*

While Comment 5 explicitly recognizes [sole source] excuse, the courts-consistent with the spirit of the impracticability doctrine-impose *strict requirements for its availability.* Thus, the source of supply must not only fail, it must have (1) been mutually contemplated by the parties as the sole source of supply, (2) *the failure must not have been foreseeable at the time of the contracting* and (3) the party seeking to be excused must have employed "all due measures" to insure that the source did not fail.

1 James J. White & Robert S. Summers, *Uniform Commercial Code* § 3–10(c), at 175–76 (4th ed.1995) (emphasis added). This test incorporates both comments 5 and 8 of § 2–615.[3]

---

**2.** Nowhere in the opening statement, closing argument, or in the argument in support of a Rule 50 Motion for Judgment as a Matter of Law did

defendant's counsel contest the validity of the contract alleged by the plaintiff.

**3.** The Ninth Circuit has followed this same analysis by applying the § 2–615 sole source excuse

Manley-Regan places its emphasis on the first part of the White & Summers § 2-615 test-whether there was an agreed sole source. The Court finds that the evidence presented establishes that the parties had agreed on a sole source. The evidence clearly shows that Ailstock knew Hess' supply was through Traiger at GFI. Hess spoke only of Traiger as his source in conversations leading up to the June 27th offer. Moreover, Hess reported frequently to Ailstock of the progress of the order from Traiger. It was clear that Traiger was the sole source of the antimony oxide to be provided by Manley–Regan and for the purposes of applying a sole source defense, the Court finds this threshold requirement met.

■ The critical requirement omitted by the defendant in its analysis is the second requirement of the White & Summers test that the failure of the sole source must have been unforeseeable to the parties at the time of contracting. Foreseeability is the key in commercial impracticality cases. *See Waldinger Corp. v. CRS Group Engineers, Inc., Clark Dietz Div.*, 775 F.2d 781, 786 (7th Cir.1985); *Heat Exchangers, Inc. v. Map Constr. Corp.*, 34 Md.App. 679, 688, 368 A.2d 1088 (1977). The rationale for the rule that an occurrence must have been unforeseeable to discharge the seller from performance rests on the issue of assumption of risk of the source failing at the time of contracting. Under ordinary circumstances, the risk that the seller's supply might fail is on the seller because he promises to supply a product knowing the conditions of the market. Therefore, where an unforeseen occurrence precludes the seller from performing, the common law and U.C.C. § 2-615 will excuse the seller from performing out of

"commercial impracticality." The seller has no way of protecting itself by way of a special contract provision [4] for unforeseen contingencies. However, when an occurrence that may preclude the seller from performing is foreseeable to the seller, he tacitly assumes the risk that the supply might fail in entering into an absolute contract without adding an escape clause.

The case law applying § 2-615 to sole source situations is sparse. However, the few cases on the issue provide sufficient authority to support application of the White & Summers analysis to this case. The one Maryland case that is helpful here is *Heat Exchangers, Inc. v. Map Const. Corp.*, 34 Md. App. 679, 368 A.2d 1088 (1977). In *Heat*, the Maryland Court of Special Appeals stated the requisites of proof for a § 2-615 defense: " '(1) a contingency must occur (2) performance must thereby be made "impracticable" and (3) the non-occurrence of the contingency must have been a basic assumption on which the contract was made.' " *Id.* at 684, 368 A.2d 1088 (quoting *Neal–Cooper Grain Co. v. Texas Gulf Sulphur Co.*, 508 F.2d 283, 293 (7th Cir.1974)). In the *Heat* case, the court considered the failure of the seller's supply of air-conditioning units as a contingency that "could have been foreseen by the seller as a real possibility and would permit a conclusion to be reached that the risk of its occurrence tacitly was assigned to Heat by reason of the failure explicitly to provide against it in the contract." *Id.* at 690, 368 A.2d 1088. In elaborating on the third requirement of § 2-615, the *Heat* court emphasized the importance of foreseeability and quoted directly from both official comments 1 and 8 of § 2-615 which expressly mention the foreseeability requirement.[5]

---

only to contracts where the failure of the sole source was not foreseeable at the time of contracting. *InterPetrol Bermuda Ltd. v. Kaiser Aluminum International Corp.*, 719 F.2d 992, 999 (9th Cir.1983) ("Section 2-615 applies only when the events that made the performance of the contract impracticable were unforeseen at the time the contract was executed.").

**4.** For example, in *Olson v. Spitzer*, 257 N.W.2d 459 (S.D.1977), a contract between a buyer and seller of combines contained an exculpatory clause "making the transaction 'subject to [seller's] ability to obtain such Equipment from the

manufacturer;' " therefore where seller was unable to obtain the exact type of combine buyer wanted, the exculpatory clause excused his performance. *Id.* at 463.

**5.** Comment 1 states in pertinent part: "This section excuses a seller from timely delivery of goods contracted for, where his performance has become commercially impracticable because of *unforeseen supervening circumstances* not with the contemplation of the parties at the time of contracting." U.C.C. § 2-615 cmt. 1 (1997) (emphasis added). Comment 8 is quoted *supra*.

In another sole source case, *Alamance County Board of Education v. Bobby Murray Chevrolet, Inc.*, 121 N.C.App. 222, 465 S.E.2d 306 (1996),[6] foreseeability was considered in an agreed sole source situation where a car dealership's sole source of bus chassis failed. The *Bobby Murray* court stated, "assuming arguendo GM was contemplated by the parties as Bobby Murray's exclusive source, the record reflects that Bobby Murray assumed the risk of its failure to supply the vehicles, as it was foreseeable that GM might not supply the bus chassis." *Id.*, 465 S.E.2d at 311. Thus, the case law supports the White & Summers analysis that where the failure of an agreed sole source is foreseeable, the seller is deemed to have tacitly assumed the risk of such failure unless it has otherwise protected itself through an exculpatory clause in the contract. Here, Manley–Regan's knowledge of the problems with the supply of antimony oxide made the failure of its sole source foreseeable and thus § 2–615 will not excuse Manley–Regan from performing its contractual obligation to Rockland.

The undisputed facts in the present case clearly establish that the market for antimony oxide was at best uncertain. Supply had become extremely difficult to obtain and prices had more than doubled within a six-month period. The Court concludes that both Ailstock and Hess knew the Manley–Regan's supply of antimony oxide could fail given the crisis in the market and the extraordinary measures Rockland was taking to ensure a guaranteed supply to sustain its business. Accordingly, the Court finds the failure of Manley–Regan's sole source for antimony oxide a foreseeable contingency at the time of contracting, and Manley–Regan therefore bore the risk of its occurrence.

### III.

In light of these findings, the Court turns to the issue of damages. In this litigation, Rockland requested three categories of damages-(1) cover damages pursuant to U.C.C.

§ 2–712; (2) prejudgement interest; and (3) attorneys' fees. With respect to cover damages, § 2–712 states in relevant part:

(1) After a breach within the preceding section the buyer may "cover" by making in good faith and without unreasonable delay any reasonable purchase of or contract to purchase goods in substitution for those due from the seller.

(2) The buyer may recover from the seller as damages the difference between the cost of cover and the contract price together with any incidental or consequential damages as hereinafter defined (§ 2–715), but less expenses saved in consequence of the seller's breach.

Md.Code Ann., Com. Law § 2–712 (1997).

The only threshold issue that the Court must resolve is the reasonableness of the cover purchases. Official Comment 2 states the test of proper cover test is simply: "[W]hether at the time and place the buyer acted in good faith and in a reasonable manner, and it is immaterial that hindsight may later prove that the method of cover used was not the cheapest or most effective." *Id.* § 2–712 cmt. 2. Plaintiff identified two contracts for antimony oxide as its cover purchases. The first contract was entered into by Leaderman on September 19, 1994, with ICC c/o Dunleary for 44,092 pounds at $2.65 per pound. The second contract was entered into by Ailstock on September 30, 1994, with Chi Mei for 40 metric tons (88,184 pounds) at $5,600 per ton ($2.54 per pound). The cover damages thus consists of the entire 44,092 pounds from the ICC c/o Dunleary contract and 69,908 pounds of the Chi Mei contract, totaling 114,000 pounds, the estimated amount of antimony for the three containers ordered from Manley–Regan. Based on the contract prices, plaintiff claims cover damages of $89,210.12.

The defendant disputed the reasonableness of Rockland's cover purchases. On cross examination of Berman, defendant established that Rockland did not issue a demand

---

**6.** It should be noted that this case was brought to the Court's attention in a post-trial letter by defendant's counsel to support its theory that foreseeability is not an element of a defense of commercial impracticability in agreed sole source contracts. Letter from Stephen H. Kaufman, Levin & Gann, P.A. to the Honorable Marvin J. Garbis of 12/9/97 at 2 (the letter was inadvertently misaddressed to Judge Garbis instead of the author of this Opinion.).

letter to Manley–Regan until December 19, 1994, over three months after Hess told Ailstock the antimony oxide would not be delivered, and that in September 1994, Rockland actually had enough antimony oxide either in stock or on order to last until February 1995. Defendant also showed how prices for antimony oxide eventually stabilized and dropped during late winter and spring of 1995. From this evidence, Manley–Regan questioned Rockland's immediate execution of contracts for antimony oxide from ICC c/o Dunleary and Chi Mei during the last quarter of 1994, when the prices were still very high. To show that Rockland's cover purchases were reasonable, Berman testified that he personally investigated the market for antimony oxide as soon as he heard of the breach. He read the *London Financial Times* and the *Metal Bulletin's Prices & Data 1995* and talked to several suppliers to get information on the trend in the market. Berman contends that Rockland sought adequate cover contracts as soon as practicable because it understood that prices for antimony oxide were in the $2.50—$3.00 range and were still on the rise, although conceding that some of his sources indicated that prices would stabilize and then drop in early 1995. Therefore Manley–Regan asserts that Rockland was not reasonable in covering immediately knowing the prices would be falling soon and given that Rockland's stockpile of antimony in September 1994, was sufficient through January or February 1995. In fact, the prices for antimony did stabilize in February 1995, and continued to fall through the spring of 1995; however, as official comment 2 to § 2–712 states, hindsight is immaterial. The critical time to examine is the time of the breach. The Court finds Rockland did act reasonably in deciding to cover given their understanding of the difficulty in obtaining its supply of antimony oxide and the volatility of the market. Antimony oxide is critical to Rockland's manufacturing and coupled with the uncertainty of the market, a reasonable person could find that immediate cover was prudent. Moreover, the prices Rockland paid were in line with the upward trend in prices. In fact, Hess did not try to obtain a substitute source because the price had gone up and it would have been impossible to purchase antimony oxide at $1.80 per pound.

The Court, accordingly, grants plaintiff's claim for cover damages; however, some modification of the amount calculated and claimed is appropriate. When computing cover damages under § 2–712, it is the actual *cost* of cover, not the *contract price.* Plaintiff's claimed damages reflect the contract prices and thus are overstated. In order to arrive at the correct amount of damages, each of the two cover purchases must be examined separately. The first cover purchase was made from ICC c/o Dunleary for 44,092 pounds at $2.65 per pound. The cost of this first cover purchase from ICC c/o Dunleary matches the contract price of $116,843.80. The second cover purchase was made from Chi Mei for 88,184 pounds, 69,908 pounds of which is applied to cover the Manley–Regan contract. However, this cover purchase must be broken down because it was delivered in two separate shipments. Also, the cost of the cover purchase from Chi Mei differs from the contract price because the arrangement with Chi Mei was to pay the market price at the time of delivery. As stated on the purchase orders, one half of the order was shipped sometime after May 22, 1995, when the price of antimony had fallen to $2.06 per pound so the first 44,092 pounds cost Rockland $90,829.52. The remaining 25,816 pounds were shipped sometime after July 31, 1995, when the price had risen slightly to $2.11 per pound costing Rockland $54,471.76. Therefore, the total cost of cover-$116,843.80 + $90,829.52 + $54,471.76—amounts to $262,145.08. Applying the formula in § 2–712, the difference between the cost of cover ($262,145.08) and the Manley–Regan contract price ($205,200.00) is $56,945.08. The Court finds this to constitute the amount of cover damages as calculated under § 2–712.

With respect to plaintiff's claim for prejudgment interest, the Court finds that such an award is not appropriate in this case. The law in Maryland is clear that where damages are not liquidated, prejudgment interest is generally not awarded. *See Taylor v. Wahby,* 271 Md. 101, 113, 314 A.2d 100 (1974) (holding that where the amount of

damages does not become liquidated until the verdict of the court, "the usual tort .rule · in regard to unliquidated claims for damages applies, *i.e.,* that interest runs from the time of the verdict") (emphasis in original); *Lawhorne v. Employers Insurance · Co. of Wausau,* 343 Md. 111, 123, 680 A.2d 518 (1996) (" '[T]he general rule ... apart from statute, [is ·that] prejudgment interest is not recoverable on claims that are neither liquidated as a dollar sum nor ascertainable by fixed standards.' ") (quoting 1 D. Dobbs, *Law of Remedies* § 3.6(1) at 336 (2d ed.1993)); · *Loyola Federal Savings Bank v. Hill,* 114 Md.App. 289, 308–09, 689 A.2d 1268 (1997) (citing with approval, *Taylor* and *Lawhorne).* Although this is a contract action, the general prejudgment interest rule still applies. More often than in tort cases, claims for damages in contract actions will in fact· be liquidated or reasonably ascertainable, and thus where "the contract *requires payment of a sum certain* on a date certain· ... prejudgment interest typically is allowed as a matter of right." *Crystal v. West & Callahan, Inc.,* 328 Md. 318, 343, 614 A.2d 560 (1992) (citations omitted) (emphasis added); *accord Maxima Corp. v. 6933 Arlington Dev. Ltd. Partnership,* 100 Md.App. 441, 459, 641 A.2d. 977 (1994); *I.W. Berman Properties v. Porter Bros., Inc.,* 276 Md. 1, 16–18, 344 A.2d 65 (1975). In the present case, however, Manley–Regan's obligation was not to pay a sum certain, but rather, to deliver a quantity of goods. Thus, the "sum certain" rule does not apply to this contractual arrangement and prejudgment interest is not applicable. Plaintiff's argument that prejudgment interest is a matter of judicial discretion is correct. *See Crystal,* 328 Md. at 343, 614 A.2d 560; *I.W. Berman Properties,* 276 Md. at 18, 344 A.2d 65. However, this. does not alter the general rule that where a claim for damages is unliquidated, prejudgment interest is not appropriate. In cases where prejudgment interest was in fact awarded despite a claim for unliquidated damages, there were extenuating circumstances or a reasonably ascertainable amount of damages that allowed for a court to find exception with the general rule and such an award was consistent with equity and justice. *See Crystal,* 328 Md. at 343, 614 A.2d 560 (finding that trial court did not

abuse its discretion to find prejudgment interest in contract action where the claim was somewhere between liquidated and unliquidated). However, in this case, the damages claimed were not liquidated and the Court finds no compelling reason to exercise its discretion and depart from the general rule of prejudgment interest awards; accordingly, prejudgment interest will not be awarded as part of plaintiff's damages.

█ Finally, consistent with the Court's rulings on defendant's motion in limine to exclude evidence of attorneys' fees and on defendant's motion for judgment as a matter of law made at the end of plaintiff's case in chief, plaintiff's request for attorneys' fees is foreclosed. Rule 54(d) of the Federal Rules of Civil Procedure is clear that this claim for attorneys' fees needed to be proven as an element of damages at trial. While plaintiff's complaint referred to attorneys' fees, the claim was never identified during the entire discovery process. Most compelling is plaintiff's computation of damages as an answer to interrogatories in which attorneys' fees are completely absent. The Court found that the failure to identify the attorneys' fees claim properly did prejudice the defendant; accordingly, plaintiff was precluded from introducing evidence to prove attorneys' fees during the trial and such recovery is thus unavailable.

### IV.

For all of the foregoing reasons, the Court finds defendant liable in the amount of $56,-945.08 for failing to supply antimony oxide to plaintiff. Judgment will be entered in accordance with this Opinion. ·

### ORDER OF JUDGMENT

In accordance with the Opinion filed herein on this date, IT IS, this 15th day of January, 1998, by the United States District Court for the District of Maryland, ORDERED:

(1) That JUDGMENT is ENTERED in favor of plaintiff Rockland Industries, Inc., against E + E (US) Inc., Manley–Regan Chemicals Division in the amount of Fifty–Six Thousand, Nine Hundred, Forty–Five

Dollars and Eight Cents ($56,945.08) with costs; and

(2) That any and all prior rulings made by the Court disposing of any claims against any parties are incorporated by reference herein, and this Order shall be deemed to be a final Judgment within the meaning of Fed.R.Civ.P. 58.